[No. A130811. First Dist., Div. Two. Dec. 19, 2011.]

Adoption of MYAH M., a Minor.
JANICE M. et al., Plaintiffs and Respondents, v.
MISTY F. et al., Defendants and Appellants.

## COUNSEL

Jacob I. Olson and Mary R. Williams, under appointments by the Court of Appeal; Leigh Ellen Johnson; Jon Christopher Weir; Kosloff & Greenwood and Oliver A. Greenwood for Defendants and Appellants.

Law Office of Gradstein & Gorman and Seth Gorman for Plaintiffs and Respondents.

## OPINION

**LAMBDEN, J.**—Misty F. (mother) and Jesse M. (father), the biological parents of Myah M., agreed when Myah was two years old that Janice M. (paternal grandmother) and Anthony M. (paternal grandfather) should be the guardians of Myah.[1] The court issued an order in 2006 pursuant to the parties' stipulation, which granted letters of guardianship to the paternal grandmother and paternal grandfather (collectively, paternal grandparents). Four years later, in 2010, the grandparents requested to adopt Myah and to terminate parental rights of mother and father pursuant to Probate Code section 1516.5. The court found that adoption was in Myah's best interest and ordered the termination of parental rights of mother and father.

On appeal, mother and father separately challenge the order terminating their parental rights by attacking the 2006 order of guardianship. They maintain that the court knew of the allegations of the parents' unfitness and the court violated their due process rights under Probate Code section 1513, subdivision (c) and our holding in *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581 [124 Cal.Rptr.3d 642] (*Christian*) when it did not refer the case to the county child welfare agency prior to issuing the guardianship order. Mother and father also directly challenge the order terminating their parental rights. They maintain that their due process rights were violated because the court did not make a finding of parental unfitness and, even if such a determination did not have to be made, substantial evidence did not support the lower court's finding that it was in Myah's best interest to terminate the parental rights of mother and father.

We are not persuaded by the arguments of mother or father. We hold that the court was not obligated to refer the matter to the county child welfare agency prior to issuing the guardianship order because unlike the situation in *Christian, supra,* 195 Cal.App.4th 581, where the appellant father contested the guardianship, mother and father in the present case stipulated to the

---

[1] Janice is father's biological mother and Anthony is father's stepfather.

guardianship after participating in mediation. We also conclude that the facts of this case did not require the court to make a finding of parental unfitness and substantial evidence supported the lower court's finding that terminating parental rights was in Myah's best interests.

## BACKGROUND

Mother and father are the biological parents of Myah, who was born in 2004. Mother has another child who was living with mother and father when Myah was born.[2] She has two other children who were given up for adoption shortly after they were born.

Mother and father had drug issues and an unstable relationship. When Myah was five or six months old, they began to leave Myah with paternal grandparents. In the beginning, they left her with them for a day or weekends but by the time Myah was 10 months old they were leaving her with paternal grandparents for about five days a week. By February 2006, paternal grandparents were caring for Myah full time. Paternal grandparents reported that, in 2006, Myah had behavioral issues such as hitting her head when she heard loud noises and screaming.

Father and mother were living together in a trailer. Mother testified that both she and father engaged in domestic violence. They were both using methamphetamine. In addition, the parents had a history of alcohol and cocaine abuse. In March 2006, the parents were arrested on drug possession charges.

The maternal grandmother and paternal grandparents consulted with Child and Family Services (CFS). Following the instructions of the CFS worker, in April 2006, the maternal grandmother petitioned the court to be reinstated as the legal guardian of Myah's half brother, and paternal grandparents filed a petition for temporary and permanent guardianship of Myah. On April 12, 2006, the court issued the temporary guardianship.

A court investigator provided a report and recommendation pursuant to Probate Code section 1513. The investigator noted that the CFS worker had contacted the parents in May 2006, but closed the case once paternal grandparents filed for guardianship. The investigator checked a box in the report indicating that there had been no referral to CFS. The investigator visited Myah in the grandparents' home and noted that she seemed clean,

---

[2] Prior to Myah's birth, her older half brother had been placed in a legal guardianship with his maternal grandmother. He remained in this guardianship until October 2003, when he was returned to mother's care. At that time, mother was living with father.

appropriately dressed, alert, playful, and affectionate. The investigator recommended that the parents have supervised visitation, submit to random drug screens, and complete treatment and/or counseling. Mother and father never responded to the investigator's letters asking them to contact her.

At the hearing on the paternal grandparents' petition for appointment of permanent guardianship for Myah, both mother and father appeared. The court ordered the parties to participate in mediation and continued the matter. It ordered supervised visits between Myah and her parents.

Paternal grandparents, father, and mother participated in mediation and then entered into a stipulation that was filed on July 14, 2006.[3] Mother agreed that she would not contest the granting of guardianship of Myah to paternal grandparents. She also agreed to drug testing. Father agreed that it was in Myah's best interest for his parents to be granted guardianship. He also agreed to drug testing. The parties concurred that mother and father could visit with Myah when paternal grandparents were present.

On July 14, 2006, the court accepted the stipulation and appointed paternal grandparents to be Myah's guardians. The court order provided that "unsupervised visitation [between Myah and mother and father] shall be allowed only after [the parent has] two clean [drug] tests and while the parent is participating in random drug testing."

In 2006 or 2007, father participated in Proposition 36 diversion and services. Mother was incarcerated from the end of 2006 through 2007.

In January 2009, after paternal grandmother was diagnosed with cancer, paternal grandparents asked father to move into the home and help care for Myah. He moved into the home of paternal grandparents.

On May 19, 2009, according to paternal grandfather, he was on the phone with mother and talking to her about her request to visit Myah at a place outside the home. Paternal grandfather did not think it was a good idea, and father became angry. Paternal grandfather explained that the following occurred: "[Father] grabbed me by the neck, threw me up against the wall, hit me in the ear, really, it was the side of the head, threw me down. And it was all in front of [Myah]. And, also [Myah] went screaming and crying." Paternal grandfather called the police. Paternal grandmother testified similarly. Father said that he picked paternal grandfather up, but did not slam him against the wall. He said that he became frustrated.

---

[3] The mediation included mother, father, the maternal grandmother, and the paternal grandparents. All of the parties were in propria persona. The stipulation also included an agreement that the maternal grandmother and maternal grandfather would be granted guardianship over Myah's half brother.

Father moved from the home of paternal grandparents in July 2009, when he was arrested for drug possession. When asked during the trial on adoption and termination of parental rights whether he resumed using methamphetamine during the years 2007, 2008, or 2009, father responded, "I don't recall." Father said that he last used drugs in late February 2010, when he was arrested for drug possession. Mother stated that she also participated in formal drug treatment services during this period, but continued to use drugs.

On September 8, 2009, paternal grandparents filed a petition requesting to adopt Myah and to terminate parental rights. They asserted that father and mother "have a long criminal history, drug abuse and domestic violence issues." They stated that both parents were arrested on March 11, 2006, for possession of drugs, and that neither parent had made any provisions for support of Myah since February 2006. They further stated that mother had given up her eldest son for guardianship and two other children for adoption.

In January 2010, the parents appeared and objected to termination of their parental rights. The matter was continued several times for counsel to be appointed for them. Once counsel was appointed, father filed objections and requested dismissal of the petition to terminate parental rights. Paternal grandparents filed a notice that they were proceeding under Family Code section 7800 and Probate Code section 1516.5, as alternate theories.

The court held a hearing on March 30, 2010. The court, among other things, consolidated the guardianship proceeding into the adoption proceeding pursuant to section 8802 of the Family Code.

On April 9, 2010, paternal grandparents filed a new petition pursuant to Probate Code section 1516.5. In May, the court considered mother's request for visitation orders, since paternal grandparents were not allowing her to have contact with Myah because of mother's drug use. The court told them to get together and work out a plan for supervised visits. The parties filed a stipulation that mother was to have supervised visits for two hours every Sunday afternoon at paternal grandparents' home and to have phone calls three days a week. Father was to have supervised visits every Saturday and phone contact twice a week.

The court investigator, Anne Silber, completed a report and recommendation on June 21, 2010. Silber stated that the parents opposed the proposed termination of their parental rights but supported the continuation of the guardianship, as they recognized that they were not in a position to provide a stable home for Myah. Paternal grandparents told her that the parents were long-term drug users and that they lacked stable housing and employment. They said that they would permit the parents to have contact with Myah after

any adoption. The parents, however, expressed concern that paternal grandparents would move out of state, where they have extended family, and cut off the parents' contact with Myah. Paternal grandmother stated that she did not know if they would remain in California after her husband retired, because both of them have family in Pennsylvania and Wisconsin. She said that the parents have both threatened her life and that neither has done the drug testing or counseling ordered by the court.

Silber stated that father asserted that paternal grandparents reported at the time he first agreed to the guardianship that they would never take Myah away from him. He declared that he now believed they wanted to take her from him.

Silber also listed mother's extensive criminal history dating from 1998 until 2010. She also set forth father's criminal history, which included possession of controlled substances in 2002 and 2006.

Silber recommended that the court grant the petition of paternal grandparents. She explained: "This is a complex case because, while the parents are not in a position to regain custody of Myah and guardianship is still clearly appropriate, Myah has a relationship with both of her birth parents. The parents have not used the services available to stabilize their lives, such as drug treatment and anger management, although they have had ample time to do so. They have continued to call and visit Myah and give her gifts. They claim that [the guardians have refused] their offers of financial support . . . . Myah expressed positive feelings about seeing her parents (although her responses were limited). The parents state that they do not want to disrupt Myah's life but only want to maintain a relationship with her. The petitioners state that they will allow the birth parents to continue to have contact with Myah, but the parents do not trust that petitioners will keep that commitment. [¶] Probate Code [s]ection 1516.5 requires a determination that the child would benefit from being adopted by the petitioners, based on consideration of all factors related to the best interest of the child, including the child's relationships with the parents, guardian and guardian's family, and siblings or half siblings. Myah would benefit from the proposed adoption in that she would have a secure, loving home that could not be disrupted. She could receive Social Security benefits in the event of the death of one or both petitioners while she is a minor. She would also be able to inherit from the petitioners (although an adoption is not necessary for that purpose). On the other hand, Myah appears to enjoy and benefit from her relationship with her birth parents and half sibling. The ideal outcome for Myah would probably be an adoption by petitioners in which she was guaranteed the right to continue her relationships with her birth parents and half brother, if that is possible."

On June 22, 2010, the court appointed counsel for the minor.

Trial on the petition of paternal grandparents began on October 19, 2010. Mother, father, and maternal grandmother testified that they were concerned that paternal grandparents would prevent the parents from having contact with Myah if the court terminated their parental rights.

Paternal grandmother testified that father had visited Myah and Myah looked forward to her visits with him. She agreed that it was in Myah's best interest to have ongoing contact with mother and father. When asked for her reasons for wanting to terminate parental rights, she responded: "Because we would like to provide [Myah] a stable, secure home, one without the conflict and emotional turmoil that has been going on. She deserves to have a life like a normal child does . . . ." She continued: "We also have committed ourselves to providing her the emotional stability that she needs. We love this child to death. We want to take care of her. [¶] But we also need to have a stable home life, something without interference, without the threat that we continually receive from the parents about showing up at her activities. . . . And the threats of physical abuse. The continued verbal abuse we take from the parents. That's not creating an environment that is good for raising this child. [¶] When we're away from the Bay Area, or there's no other contact, it's a whole different world. We all feel that [Myah] feels it. She loves it. She loves to go to Wisconsin and stay there forever. There's no interference in her life. [¶] Right now there's always a constant interference, unlike other children. And that's what we want to give to her. She has that right to have a stable home, one that is secure, and one that is going to be there forever without this constant threat [that] someone is going to take her from us or take her back. We don't know what type of a situation they're in. [¶] They asked us to watch her until 18 years old. I think we have a right to adopt her."

Paternal grandmother explained that when she said that she wanted to be free of interference, she was not referring to the need to provide visitation to the parents. Rather, she was referring to the parents yelling in front of Myah. She elaborated that the parents yell at her and threaten her about the way they are raising Myah. Paternal grandfather testified that he intended to allow Myah to have continued contact with her parents.

Silber, the court investigator, testified. She stated that paternal grandparents were clear with her that they were going to continue to allow contact between Myah and the parents. The court expressed concern that paternal grandparents could stop contact between Myah and mother and father if they became the legal parents of Myah. Silber stated that it was her "hope" that the "parties could come to an agreement in mediation." Silber commented that this was an unusual case because generally parents have been absent for a long time when the court was considering whether to terminate the parental rights. When asked if it were not possible for the outcome to be adoption with the

guaranteed right for Myah to continue her relationship with mother and father, what would her next recommendation be, Silber replied: "For continuation of the guardianship, perhaps with some mediation around visitation. I don't know how the visitation is going now. This is a few months ago, but I know there were some issues then."

The court asked Silber whether Myah would be better off having contact with mother and father even if there was conflict. She answered that as a result of her background in social work, she believed it would be more devastating to Myah to lose contact with her biological parents and that it was not Myah's fault that the adults could not get along. She acknowledged that ongoing tension in the household "probably diminished" the benefit of seeing the biological parents. She also agreed that the guardianship had been in place for a little more than four years, giving the biological parents ample time "to get their act together," but they had failed to do that. She opined that it would be very difficult for the biological parents to terminate the guardianship at this point because Myah was doing so well in the home of paternal grandparents.

Counsel for Myah testified that Myah told him that she enjoyed her visits with mother and father and would like them to continue. When he asked her how she would feel if her paternal grandparents were going to be her parents instead, counsel stated that Myah's "affect changed notably." He said that "[h]er eyes brightened a little bit. She said that she would." When asked how she would feel if she could not see her mother and father, she said that she could not "imagine not seeing her father any more, but she did feel like her mother might forget." Counsel explained that he believed Myah meant that her mother might forget to come to see her.

The court issued its statement of decision that was filed on November 2, 2010. The court stated that the question before it was whether it was "in the best interests of the minor child to be continued under the guardianship of her current guardians or to have the parents' rights terminated so as to allow the current guardians," paternal grandparents, to adopt Myah. The court found that the guardianship of paternal grandparents "was ordered in July 2006 and consented to by both parents of the minor." The court noted that father now claimed that his consent was induced by a promise by paternal grandparents that his parental rights would never be terminated, "but the stipulation and order as to the guardianship signed by all the parties contained no explicit promise to that effect by the guardians and there is no other writing that embodies the promise that [father] asserts was made. Furthermore, even if such a promise was made, the evidence shows that the events that have happened following the original guardianship order compel a finding that it is in the minor's interest that the parental rights be terminated." The court found

that paternal grandparents had "provided a safe and secure home for the minor for four years pursuant to their guardianship including providing for the minor's education." The court also found that Myah had bonded to and had great affection for both her paternal grandparents and her biological parents. Further, the court determined that paternal grandparents had permitted visitation with the biological parents, but the parents had "been less than consistent in making sure that they adhered to the visitation schedule." The court noted that father had stayed in paternal grandparents' home when paternal grandmother was diagnosed with cancer, but he was removed after using physical force in an argument with the grandfather. It also observed that mother had a fairly extensive criminal record, including a felony conviction for drugs and violations of probation, as well as a pending felony drug charge for an offense allegedly committed prior to November 2009. It pointed out that mother had testified that she believed she was not eligible for probation for the pending offense due to prior convictions. Father, the court observed, also had a felony drug conviction and had a pending misdemeanor drug offense, which allegedly took place in February 2010.

The court stated that the parents had been given ample time to change their behavior and lifestyle in order to become custodial parents, but they had failed to do so. The court concluded that it was in the child's best interests to free her from the custody and control of her biological parents pursuant to Probate Code section 1516.5, and to permit her paternal grandparents to adopt her.

Mother and father separately filed timely notices of appeal.

## DISCUSSION

### I. *Jurisdiction and the Order of Guardianship*

Mother and father both argue that the probate court's order granting the letters of guardianship that was filed in July 2006 violated their due process rights because they claim the court had to refer the case to CFS under Probate Code section 1513, subdivision (c) and our holding in *Christian, supra*, 195 Cal.App.4th 581. Both parents in their reply briefs clarify that they are not asking this court to reverse the guardianship order. To the extent their arguments in their opening briefs can be construed as a direct challenge to the guardianship order, we briefly address this issue.

■ A "timely notice of appeal, as a general matter, is 'essential to appellate jurisdiction.' [Citation.] It largely divests the superior court of jurisdiction and vests it in the Court of Appeal. [Citation.] An untimely notice of appeal is 'wholly ineffectual: The delay cannot be waived, it cannot be

cured by nunc pro tunc order, and the appellate court has no power to give relief, but must dismiss the appeal on motion or on its own motion.' [Citation.] The purpose of the requirement of a timely notice of appeal is, self-evidently, to further the finality of judgments by causing the [party] to take an appeal expeditiously or not at all." (*People v. Mendez* (1999) 19 Cal.4th 1084, 1094 [81 Cal.Rptr.2d 301, 969 P.2d 146].)

■ An order granting the letters of guardianship is final and appealable under Probate Code section 1301, subdivision (a). (See also *Guardianship of Kaylee J.* (1997) 55 Cal.App.4th 1425, 1429 [64 Cal.Rptr.2d 662].) A notice of appeal must ordinarily be filed 60 days after the date of service of a notice of entry of judgment or 180 days after entry of judgment. (Cal. Rules of Court, rule 8.104.) Here, the order granting the letters of guardianship was filed in July 2006; the notices of appeal filed by mother and father from the order terminating their rights were filed in 2011. Thus, any challenge to the 2006 guardianship order is untimely. (See *In re Kandarian* (1921) 187 Cal. 479, 480 [202 P. 647] [court has no jurisdiction over untimely appeal from order appointing guardians].)

■ Challenges to void orders, as distinguished from voidable orders, can be made at any time. A judgment or order is void when there is an absence of fundamental jurisdiction. However, an act in excess of jurisdiction simply renders an order of judgment voidable. "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of . . . authority over the subject matter or the parties. [Citation.]" (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942].) In contrast, a court acts in excess of jurisdiction in the broader sense "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Ibid.*) "Action 'in excess of jurisdiction' by a court that has jurisdiction in the 'fundamental sense' . . . is not void, *but only voidable.*" (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1088 [56 Cal.Rptr.2d 386].) A claim that does not concern the trial court's fundamental subject matter jurisdiction is waived if not timely asserted. (*Keiffer v. Bechtel Corp.* (1998) 65 Cal.App.4th 893, 898 [76 Cal.Rptr.2d 827].)

Here, the probate court clearly had jurisdiction over the subject matter under Probate Code section 1514, and we have no jurisdiction to review the 2006 guardianship order.

## II. *Due Process and the Failure to Refer the Case to CFS*

### A. *Introduction and the Involvement of CFS*

Mother and father argue that the probate court's failure to make the referral to the CFS as mandated by Probate Code section 1513, subdivision (c) and our holding in *Christian, supra,* 195 Cal.App.4th 581, prejudicially affected the decision to terminate their parental rights and violated their due process rights. As a consequence of the 2006 order, they claim that they were deprived of all the attendant safeguards provided in dependency proceedings that are not available in guardianship proceedings.

Paternal grandparents argue that the matter was referred to CFS prior to the 2006 guardianship order. They assert CFS investigated by visiting their home, interviewing father, and attempting to interview mother, but the agency closed the case once maternal grandmother filed a petition for guardianship over Myah's half brother and they filed a petition for guardianship over Myah. They argue that the social worker made an assessment and decided not to initiate a dependency proceeding. They maintain that the welfare worker did not have to provide the court with a written report of the investigation and, even if the worker did have to provide a written report, there was no prejudice because the court investigator included the information garnered from the social worker in her report. (See *Guardianship of H.C.* (2011) 198 Cal.App.4th 1235, 1250 [130 Cal.Rptr.3d 316].)

Both parents respond that CFS's limited investigation was insufficient to satisfy the requirements of Probate Code section 1513, subdivision (c).[4] They maintain that in the case cited by paternal grandparents a complete investigation was done by the child protective services. (See *Guardianship of H.C., supra,* 198 Cal.App.4th 1235.) Here, the report by the court investigator

---

[4] Probate Code section 1513 provides in relevant part: "(a) Unless waived by the court, a court investigator, probation officer, or domestic relations investigator may make an investigation and file with the court a report and recommendation concerning each proposed guardianship of the person or guardianship of the estate. Investigations where the proposed guardian is a relative shall be made by a court investigator. Investigations where the proposed guardian is a nonrelative shall be made by the county agency designated to investigate potential dependency. . . ." "(b) The report shall be read and considered by the court prior to ruling on the petition for guardianship, and shall be reflected in the minutes of the court. The person preparing the report may be called and examined by any party to the proceeding. [¶] (c) If the investigation finds that any party to the proposed guardianship alleges the minor's parent is unfit, as defined by Section 300 of the Welfare and Institutions Code, the case shall be referred to the county agency designated to investigate potential dependencies. Guardianship proceedings shall not be completed until the investigation required by Sections 328 and 329 of the Welfare and Institutions Code is completed and a report is provided to the court in which the guardianship proceeding is pending."

indicated that no referral was made to CFS and she did not check the box confirming that CFS had conducted an investigation at the same time as the investigator conducted her investigation.

We agree that the record indicates that CFS did not do an investigation under Welfare and Institutions Code sections 328 and 329.[5] Thus, the question before us is whether such an investigation was mandated and, if so, whether the failure to complete one prejudicially violated the due process rights of mother and father.

## B. *Due Process Rights*

■ "The state and federal Constitutions guarantee no state shall deprive parents of [their fundamental] interest in their children without due process of law . . . ." (*David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 777 [44 Cal.Rptr.3d 799].) Mother and father are essentially arguing that the initial order of guardianship made without a referral to CFS for an investigation made the entire proceedings irreversibly flawed and violated their due process rights.[6] Preliminarily, we note that the Supreme Court has cautioned against borrowing criminal law concepts of structural error and automatically applying them to dependency. (*In re James F.* (2008) 42 Cal.4th 901, 913–914 [70 Cal.Rptr.3d 358, 174 P.3d 180]; *In re Celine R.* (2003) 31 Cal.4th 45, 59 [1 Cal.Rptr.3d 432, 71 P.3d 787].)

Mother and father provide an extensive discussion of the differences between the dependency law and probate guardianship to support their position that a due process violation should result in automatic reversal. They argue that the probate proceedings, unlike dependency proceedings, failed to provide them with family reunification services, periodic reviews of the

---

[5] Welfare and Institutions Code section 328 states that "the social worker shall immediately make any investigation he or she deems necessary to determine whether child welfare services should be offered to the family and whether proceedings in the juvenile court should be commenced. If the social worker determines that it is appropriate to offer child welfare services to the family, the social worker shall make a referral to these services . . . ."

Welfare and Institutions Code section 329 allows a social worker three weeks within which to initiate proceedings in juvenile court. If a petition is not filed, the social worker must "endorse upon the affidavit of the applicant his or her decision not to proceed further and his or her reasons therefor . . . ."

[6] Mother argues that there was a due process violation that should result in an automatic reversal of the order terminating her parental rights. Father's argument is somewhat less clear. He does not seem to be asserting reversal per se, because he provides a short discussion of prejudice. However, his prejudice discussion does not demonstrate any prejudice. Rather, he asserts that he would have received appointed counsel and reunification services had the matter become a dependency case and claims that the role of both of these "cannot be ignored in this case." This is essentially an argument that the procedure was so corrupted by the failure to refer the matter to CFS that he is entitled to automatic reversal.

child's living situation, and a presumption favoring maintenance and reunification of the biological family. They also stress that they would have had appointed counsel throughout the dependency proceedings, which they did not have when the court held the hearing on the guardianship.

 This argument might have some force in a situation where there was no stipulated agreement regarding the guardianship. "Ordinarily, a judgment entered pursuant to a stipulation is not appealable." (*Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1267 [284 Cal.Rptr. 18].) As with any order, such a judgment may be challenged if the order is void or extrinsic fraud was involved. (*Id.* at pp. 1267–1268.) As already discussed, this order was not void and the record contains no allegation or evidence in support of extrinsic fraud. Thus, as with any stipulated agreement, mother and father should not be permitted to object to the terms of their stipulation.

In any event, here, the contention of mother and father that the failure to make the referral pursuant to Probate Code section 1513, subdivision (c), violated their due process rights fails on its merits. We hold that no referral needs to be made when the parents voluntarily consent to the guardianship after mediation.

C. *No Referral to the County Child Welfare Agency Is Necessary When the Guardianship Is Pursuant to a Stipulation After Mediation*

The reliance of mother and father on our decision in *Christian, supra,* 195 Cal.App.4th 581 is misplaced. In *Christian,* we reversed the guardianship order when the lower court had failed to refer the matter to CPS (child protective services) despite the allegations of parental unfitness. (*Id.* at p. 596.) At the guardianship hearing, the father objected to the guardianship on the grounds that it was unnecessary and that the prospective guardian was not a good choice. (*Id.* at p. 590.) We held that once the probate court "received information constituting an allegation of [parental] unfitness, whether from the investigator's report or from the pleadings themselves," the court was "obligated to order the case referred to" the county agency designated to investigate potential dependencies. (*Id.* at p. 604.) In this opinion, we detailed the significant differences between probate guardianships and juvenile dependency proceedings. (*Id.* at pp. 596–602.) In the dependency system, the focus is on maintenance or reunification of the family, which is absent in the context of a guardianship proceeding. (*Id.* at p. 599.) Furthermore, the entire dependency process is procedurally more protective of parental rights and parents are entitled to the appointment of counsel during the dependency proceedings. (*Id.* at p. 600.)

The present situation is significantly different from the one in *Christian, supra,* 195 Cal.App.4th 581. As already noted, the appellant father in

*Christian* contested the guardianship proceeding. (*Id.* at p. 590.) In contrast, here, mother and father participated in mediation and voluntarily consented to the guardianship. This was not a contested removal of Myah from her home. Indeed, we pointed out in *Christian* that probate guardianships were developed for many reasons, including "when the parent voluntarily relinquishes the child to another person." (*Id.* at p. 599.) In such situations, there is no focus on maintaining or reunifying the child with the parent. (*Id.* at pp. 599–600.) Thus, probate guardianships were developed precisely for the type of situations present in this case.

Father and mother emphasize that no counsel was appointed for them or Myah prior to the Probate Code section 1516.5 hearing, and they would have received counsel in a dependency proceeding. In 2006, the court ordered the parties to participate in mediation. Mother, father, paternal grandparents, and maternal grandmother participated in the mediation and no one had legal representation. Mother and father were not entitled to counsel at the guardianship hearing (*Guardianship of H.C., supra,* 198 Cal.App.4th at pp. 1248–1249) and they cannot complain that the family would have remained intact had they received legal counsel or reunification services: they agreed that it was in Myah's best interests to be placed with paternal grandparents. When mother and father entered into the stipulation to award guardianship to paternal grandparents they "formally waived" their parental rights. (*In re Charlotte D.* (2009) 45 Cal.4th 1140, 1149 [90 Cal.Rptr.3d 724, 202 P.3d 1109] (*Charlotte D.*).)

Father claims that he did not agree to the guardianship until after there had been a temporary guardianship and a promise by paternal grandparents not to seek termination of his parental rights. He maintains that CFS should have been involved prior to his consent and therefore his consent did not relieve the court of its obligation under Probate Code section 1513, subdivision (c). This argument lacks support in the record. The stipulation did not contain any provision suggesting that paternal grandparents agreed that they would never seek to terminate the parental rights of mother and father. Accordingly, we agree with the lower court's finding that there was no such agreement.

The record unequivocally establishes that father agreed to the guardianship.[7] Father testified at the hearing on the petition for adoption and termination of parental rights that he agreed to the guardianship. At trial, father's attorney asked him the following: "When the guardianship was initially filed you did not agree with it is that correct?" Father responded: "No. I did agree with it. . . ." He claimed that he intended to get Myah back later. No matter what his later intentions were, the record establishes that he

---

[7] The fact that the temporary guardianship was already in place is of no particular significance.

voluntarily agreed to the guardianship and concurred that the guardianship was in Myah's best interest.

■ To require a referral pursuant to Probate Code section 1513, subdivision (c) when the parents have voluntarily placed their child in a probate guardianship would be bad policy. Probate guardianship is often established with parental consent (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1122 [90 Cal.Rptr.3d 701, 202 P.3d 1089] (*Ann S.*)), and parents may seek a short-term or a long-term probate guardianship to avoid the involvement of the county child welfare agency. "The differences between probate guardianships and dependency proceedings are significant. [Citation.] Probate guardianships are not initiated by the state, but by private parties, typically family members. They do not entail proof of specific statutory grounds demonstrating substantial risk of harm to the child, as is required in dependency proceedings. [Citations.] Unlike dependency cases, they are not regularly supervised by the court and a social services agency. No governmental entity is a party to the proceedings. It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under [Probate Code] section 1516.5." (*Ann S.*, at p. 1122, fn. omitted.)

Parents who recognize that their children cannot remain safely within their home might become reluctant to agree to a probate guardianship if such a stipulation would not negate the necessity of having the county child welfare agency involved. The safety of children would be jeopardized if parents did not have a choice of seeking the alternative of placing their children in a safe place without having the extensive involvement of the state.

■ Furthermore, parents should not be able to object—years later—to an agreement from which they have benefitted. Mother and father ignore that they enjoyed certain advantages by not having the case part of the dependency system. The court ordered the guardianship in 2006, and paternal grandparents did not petition to adopt Myah and terminate the parental rights of mother and father until more than four years later. In dependency proceedings, the law favors *prompt* resolution of a dependent child's status. California's juvenile dependency system contemplates a maximum reunification period of 18 months calculated from the date the child was removed from parental custody. (Welf. & Inst. Code, §§ 361.5, subd. (a)(3), 366.22, subd. (a).) After 18 months, if a child cannot be safely returned to the parents, a juvenile court *must* select adoption unless it finds terminating parental rights would be detrimental to the child under at least one of five statutory exceptions. (Welf. & Inst. Code, § 366.22.) In contrast, a probate court is not required to terminate parental rights after any period of time. It *can* order an

adoption under Probate Code section 1516.5 after a child has been in legal guardianship for two years. During the guardianship, parents who are only temporarily unable to care for their children can petition for dissolution of the guardianship. (Prob. Code, § 1601.) Thus, mother and father might have had their parental rights terminated much earlier had the matter proceeded as a dependency case and they might not have wanted the state's involvement or supervision that would have occurred in a dependency proceeding.

■ Accordingly, we conclude that a parent who voluntarily agrees to a guardianship after a mediation forfeits any right to challenge the guardianship order on the basis that there was no referral made pursuant to Probate Code section 1513, subdivision (c).

### III. *Terminating Parental Rights Without Finding Unfitness to Parent*

#### A. *Introduction*

Father argues, and mother filed a brief to join in this argument, that the court erred in issuing an order to terminate parental rights without making a finding by clear and convincing evidence of unfitness to the parent. The court terminated parental rights based on a finding of the best interests of the child and father maintains that the failure to find that he was unfit as a parent violated his due process rights.

#### B. *Probate Code Section 1516.5 and Due Process*

■ Probate Code section 1516.5 was enacted in 2003 to provide an alternative method for parental rights to be terminated. This statute provides that parental rights may be terminated "if all of the following requirements are satisfied: [¶] (1) One or both parents do not have the legal custody of the child. [¶] (2) The child has been in the physical custody of the guardian for a period of not less than two years. [¶] (3) The court finds that the child would benefit from being adopted by his or her guardian. . . ." (Prob. Code, § 1516.5, subd. (a).)

■ Due process requires " 'some showing of unfitness' " before a custodial parent's rights are terminated. (*Quilloin v. Walcott* (1978) 434 U.S. 246, 255 [54 L.Ed.2d 511, 98 S.Ct. 549].) In *Adoption of Kelsey S.*, our Supreme Court extended that protection to the natural father who lacks custody but "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise." (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*).) In *Kelsey S.*, the court was concerned with the unequal treatment

of natural fathers under the adoption statutes, as compared with mothers and presumed fathers. (*Kelsey S.*, at pp. 823–825.) A biological mother could prevent the father from receiving the child into his home, and thereby deprive him of the status of presumed father. (*Id.* at p. 825.) The court concluded that when a biological father "has sufficiently and timely demonstrated a full commitment to his parental responsibilities," this statutory scheme violated the equal protection and due process clauses of the federal Constitution to the extent it permitted "a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (*Kelsey*, at p. 849.) The biological father "must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*, fn. omitted.)

In *Ann S., supra*, 45 Cal.4th 1110 and *Charlotte D., supra*, 45 Cal.4th 1140, our Supreme Court held that Probate Code section 1516.5 did not violate a parent's substantive due process rights by authorizing termination of a parent's legal rights without a finding of unfitness. Since a parent in a guardianship case has already relinquished parental responsibility for at least two years, while the child and guardian developed interests in a stable placement and the child's care and custody, an unfitness finding is not required. (*Ann S.*, at p. 1118.)

The court in *Ann S., supra*, 45 Cal.4th 1110 cautioned that Probate Code section 1516.5 could be unconstitutional in unusual circumstances if the parent demonstrates a full commitment to parental responsibility. (*Ann S.*, at p. 1130.) If a parent " 'promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.' [Citation.]" (*Ibid.*) However, a prolonged guardianship, during which all parental rights and custodial responsibilities are suspended, with the possible exception of visitation rights, is generally inconsistent with a full commitment to parental responsibilities—emotional, financial, and otherwise. (*Id.* at pp. 1130–1132.)

The court in *Ann S., supra*, 45 Cal.4th 1110, discussed a hypothetical situation argued by the appellant that could result in a due process violation if the parents' rights were terminated without a finding of unfitness. The court explained: "[A] fully responsible parent might find it necessary to place a child in guardianship and, despite maintaining a parental commitment as full

as the circumstances permit, eventually face a termination proceeding under [Probate Code] section 1516.5. Mother posits the plight of a single mother in the National Guard, called to duty overseas, and unable to reclaim custody for two years." (*Ann S.*, at p. 1132.) The court refused to invalidate Probate Code section 1516.5 based on a hypothetical situation but stated that constitutional challenges could be made by particular parents based on the statute's application to them. (*Ann S.*, at p. 1132; see also *Charlotte D., supra*, 45 Cal.4th at p. 1143.) It seemed unlikely to the Supreme Court that a trial court would find it in a child's best interest under Probate Code section 1516.5 to terminate the rights of a fully committed, responsible, and capable parent who found an extended probate guardianship unavoidable under exigent circumstances. "Nevertheless, factors similar to those set out in *Kelsey S.* for evaluating commitment to parental responsibility might support a parent's claim that the best interest of the child standard is unconstitutional as applied to him or her." (*Charlotte D.*, at pp. 1148–1149.)

Mother and father contend that the facts in this record demonstrate that this is an unusual circumstance that required the court to find parental unfitness prior to terminating their rights under Probate Code section 1516.5.

## C. *Standard of Review*

When deciding whether a parent meets the requirements under *Kelsey S.*, appellate courts have reviewed the ruling for substantial evidence. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679–680 [87 Cal.Rptr.3d 135]; *In re J.L.* (2008) 159 Cal.App.4th 1010, 1023 [72 Cal.Rptr.3d 27]; *Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717 [57 Cal.Rptr.3d 259].) The burden is on the biological parent "to establish the factual predicate" for *Kelsey S.* rights. (*Adoption of O.M.*, at p. 679.) To the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard. (*Id.* at p. 680.)

When determining whether substantial evidence is present, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 [78 Cal.Rptr.2d 311].) We merely determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact. (*Ibid.*) Substantial evidence is "reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . ." (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401 [98 Cal.Rptr.2d 881].) The appellant must show the evidence is insufficient to support the trial court's findings. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420 [159 Cal.Rptr. 460].)

D. *Mother and Father Do Not Meet the* Kelsey S. *Requirements*

This is not an unusual case where mother and father can show that Probate Code section 1516.5 as applied to them is unconstitutional. In the present case, paternal grandparents did not prevent mother and father from seeing Myah. As the lower court found, paternal grandparents permitted visitation, "but the parents have been less than consistent in making sure that they adhered to the visitation schedule." Mother and father often missed their appointments to see Myah and could not have unsupervised visits because they had failed to comply with their agreement to be drug tested. Paternal grandmother testified that the parents started visiting regularly and wanting increased time to visit with Myah only after paternal grandparents filed their petition for adoption.

Furthermore, neither parent fulfilled his or her parental responsibilities as neither promptly defended his or her custodial rights. To the contrary, similarly to the parent in *Charlotte D.*, they both abandoned their responsibilities "and formally waived" their "parental rights when the guardianship was established." (*Charlotte D., supra*, 45 Cal.4th at p. 1149.) The court in *Charlotte D.* explained: "Although [the biological father] was living with Charlotte in his parents' home, and was evidently employed, he yielded custody to his parents as guardians and further agreed to give up his statutory parental preference in any future custody proceeding. These facts alone would preclude father from establishing a full commitment to parental responsibility." (*Ibid.*, fn. omitted.) Here, mother and father yielded custody to paternal grandparents and they have failed to take prompt legal action to defend their custodial rights. They have never taken any legal action to terminate the guardianship.

Furthermore, the record establishes that mother and father are not able or willing to take immediate custody of Myah. Under *Kelsey S.*, they must show that they are willing to assume full custody of the child. (*Kelsey S., supra*, 1 Cal.4th at p. 849.) Here, Silber, the court investigator, stated that the parents "are not in a position to regain custody of Myah . . . ." Father told the court investigator that he realizes that he is not in a position to take care of Myah. He testified that he was not "ready to have her back yet." The investigator pointed out in her report that the parents had not used the services available to stabilize their lives, such as drug treatment and anger management classes. The record shows that both parents have continued their use of drugs. Father testified that he completed formal drug treatment services and was arrested after this treatment in February 2010 for drug possession. He declared that he could not "recall" whether he resumed using methamphetamine during the years of 2007, 2008, or 2009. Mother has an extensive criminal record and was arrested again, in April 2010, for possession of a controlled substance and being under the influence of a controlled substance.

Father details the facts that show he is a caring parent. He points to his attendance at Myah's birthday parties, his care of Myah when the paternal grandmother had cancer, his gifts to Myah, and his emotional commitment to his daughter. He claims that he tried to give paternal grandparents some financial support, but they rejected his offers. He claims that there were exigent circumstances thwarting his ability to assume custody and he again argues that the failure to refer the matter to CFS hampered him.

The record establishes that father had ample opportunity to demonstrate his commitment to parental responsibilities. He was offered various treatment programs and services, but did not take advantage of these services. As already discussed, father cannot complain that he would have benefitted if the matter had proceeded through dependency proceedings because he voluntarily agreed after mediation that paternal grandparents should have guardianship over Myah. Furthermore, since the case was not in the dependency system, he has had more than 18 months to demonstrate commitment to his parental responsibilities.

"A prolonged guardianship, during which all parental rights and custodial responsibilities are suspended, with the possible exception of visitation rights, is generally *inconsistent* with 'a full commitment to . . . parental responsibilities—emotional, financial, and otherwise.' [Citation.]" (*Ann S., supra*, 45 Cal.4th at pp. 1131–1132.) Here, mother and father have not demonstrated a commitment to their parental rights and therefore the lower court did not violate their due process rights when it terminated their parental rights without finding unfitness to parent.

### IV. *Myah's Best Interests*

Probate Code section 1516.5 provides that parental rights may be terminated if the court finds that the parents do not have legal custody over the child, there has been at least two years of probate guardianship, and "the child would benefit from being adopted by his or her guardian. . . ." (Prob. Code, § 1516.5, subd. (a)(3).) Mother and father agree that the record shows that the first two requirements under Probate Code section 1516.5, subdivision (a) are satisfied. Paternal grandparents have been Myah's guardians since 2006. They argue, however, that the evidence does not support a finding of the third requirement that Myah would benefit from the adoption.

The court in *In re Noreen G.* (2010) 181 Cal.App.4th 1359 [105 Cal.Rptr.3d 521] notes that the appellate court examines the record to determine whether evidence in the record supports a finding that the child would benefit from being adopted by the guardian. However, it points out that appellate courts have generally used the abuse of discretion standard when considering a

lower court's decision to terminate parental rights. (*Id.* at pp. 1382–1383.) Accordingly, we look to see whether the court abused its discretion in applying the law and whether substantial evidence in the record supported its finding that adoption is in the child's best interests.

 Probate Code section 1516.5 specifies that in making the determination of a child's best interests, "the court shall consider all factors relating to the best interest of the child, including, but not limited to, the nature and extent of the relationship between all of the following: [¶] (A) The child and the birth parent. [¶] (B) The child and the guardian, including family members of the guardian. [¶] (C) The child and any siblings or half siblings." (Prob. Code, § 1516.5, subd. (a)(3).) The Supreme Court in *Ann S., supra,* 45 Cal.4th 1110, stated that " 'all factors relating to the best interest of the child' " included the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities. (*Id.* at p. 1132.)

Here, the record contains substantial evidence to support the lower court's finding that adoption by paternal grandparents was in Myah's best interest. During the guardianship of more than four years, mother and father failed to remedy the problems of substance abuse and anger management that necessitated the guardianship in the first place. (See *In re Noreen G., supra,* 181 Cal.App.4th at p. 1383.) The court found that both biological parents acknowledged their inability to be able to act as full-time parents for Myah.

The record shows that both parents continued to use controlled substances and were unable to control their tempers. Paternal grandmother testified about various incidents that displayed the parents' anger. For example, paternal grandmother testified that on November 29, 2009, mother had a scheduled visit and called to report that she was running late. Paternal grandfather told her that it was too late for her to come to the house. Paternal grandmother left the house and when she returned home mother was at the house. Mother began to pound on the garage door and threatened paternal grandmother. Paternal grandmother testified that mother threatened her life and threatened physical harm against her. Paternal grandmother called the police and they arrested mother. With regard to father, paternal grandfather testified that father grabbed him by the neck and threw him against a wall in May 2009. He also described a number of instances when father displayed anger in front of Myah. For example, he described an incident in September 2010 when he asked father to remove his belongings from the house. Father started yelling and screaming and Myah started to cry and ran back into the house.

 The record also supports the lower court's finding that paternal grandparents have provided a safe and secure environment for Myah. Paternal

grandmother testified that adoption would provide Myah with the safety and security that she deserves. "For young children and those children for whom adoptive parents are available, adoption is usually the preferred placement because it offers the prospect of a secure permanent home." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 258 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) When Myah's counsel asked Myah how she would feel if her paternal grandparents were going to be her parents instead of her mother and father, counsel stated that Myah's "affect changed notably." He said that "[h]er eyes brightened a little bit. She said that she would."

Father argues that the court's decision that Myah's stability and peace of mind that would result from adoption outweighed the bond she shared with her parents was "injudicious" and "erroneous." He cites to the extensive evidence that Myah was attached to him. He maintains that Myah had peace of mind in her placement with the guardians and the guardianship should have continued. He argues that the stability from adoption was no different than the stability Myah already enjoyed with her paternal grandparents having legal guardianship. He contends that the court mistakenly focused on the parents' current fitness to assume custody, and the fact that father recognized that he was not currently able to care for her should not have resulted in the termination of his parental rights. Mother makes a similar argument.

In making the foregoing argument, father relies on *Guardianship of L.V.* (2006) 136 Cal.App.4th 481 [38 Cal.Rptr.3d 894], and both parents cite *In re Amber M.* (2002) 103 Cal.App.4th 681 [127 Cal.Rptr.2d 19]. In *Guardianship of L.V.*, the parents were seeking to end the guardianship under Probate Code section 1601. The parents argued that because they were now able to care for their children "it was their constitutional right to have the guardianship terminated and the minor returned to their custody." (*Guardianship of L.V.*, at pp. 486–487.) In rejecting this argument, the appellate court explained that their ability to care for the child now was not the statutory standard. Rather, it was the best interest of the child that governed whether the trial court should terminate a guardianship and return the child to the parents' care. (*Id.* at p. 489.) The court explained that under Family Code section 3041, " ' "detrimental to the child" includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require any finding of unfitness of the parents.' " (*Guardianship of L.V.*, at p. 491.)

The court in *Guardianship of L.V., supra*, 136 Cal.App.4th 481, did not address termination of parental rights under Probate Code section 1516.5. Rather, the court simply rejected the parents' argument that the standard of

the child's best interest was unconstitutional as applied to them because they were now able to care for the child. This court's holding does not suggest, as mother and father argue, that the parents' inability to assume immediate custody of the child is not a factor to be considered when deciding whether to terminate parental rights. Although this case has limited applicability to the present case, the reasoning underlying *Guardianship of L.V.*, supports the lower court's decision in the present case to terminate the parental rights of mother and father. Myah has been in her paternal grandparents' care for almost her entire life and it would be detrimental to her to remove her from the care of paternal grandparents.

The parents' reliance on *In re Amber M., supra*, 103 Cal.App.4th 681, is similarly unavailing. In *Amber M.*, the appellate court reversed the order terminating parental rights under Welfare and Institutions Code section 366.26, because it held that the evidence did not support the finding that the subdivision (c)(1)(A) exception to adoptability did not apply. Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) sets forth an exception to terminating parental rights on a finding of adoptability if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

 Probate Code section 1516.5 does not contain the exceptions set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1). Rather, Probate Code section 1516.5 mandates a balancing test, where the court balances all of the facts related to the child's best interests.

Additionally, the facts in *In re Amber M., supra*, 103 Cal.App.4th 681, are distinguishable from those in the present case. The mother in *Amber* maintained regular visitation and contact with her children and the children had been in her care for significant periods of their lives. (*Id.* at p. 689.) The court stated that "[t]he common theme running through the evidence from the bonding study psychologist, the therapists, and the CASA [court appointed special advocate] is a beneficial parental relationship that clearly outweighs the benefit of adoption." (*Id.* at p. 690.) The court concluded that mother was devoted to her children "and did virtually all that was asked of her to regain custody." (*Ibid.*) The court noted that mother was not yet able to regain custody, but held that was not sufficient to justify the termination of parental rights when the exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(A) applied. (*In re Amber M.*, at pp. 690–691.)

In contrast to *In re Amber M.*, here the record shows that mother and father have been inconsistent regarding their scheduled visits with Myah. Moreover, as the trial court found and the investigator stated, the parents had not changed their lifestyle, were still involved with drugs, and had anger management issues. As already noted, Myah has spent most of her life with paternal

grandparents, not the parents, and the court properly found that Myah had a more significant bond with her paternal grandparents than she did with her parents. Myah has a strong bond with her father and some bond with her mother, but these bonds did not require the court to find it was not in her best interest to be adopted by her paternal grandparents when it weighed all of the factors.

Mother also cites *In re S.B.* (2008) 164 Cal.App.4th 289 [79 Cal.Rptr.3d 449], another dependency case. In *S.B.*, the appellate court considered an appeal from the order terminating the father's parental rights when the father stated that he had shown the continuing beneficial relationship exception to termination of parental rights. The father had maintained a parental relationship with the child through consistent contact and visitation and his devotion to his child was evinced by "his full compliance with his case plan and continued efforts to regain his physical and psychological health." (*Id.* at p. 300.)

For the same reasons already discussed with regard to *In re Amber M.*, *In re S.B.* is inapplicable to the present case. The parents, here, have not shown devotion to Myah by working on the problems that caused the guardianship and their contact and visitation with her have been inconsistent. Furthermore, as already stressed, showing an exception to adoption under Welfare and Institutions Code section 366.26, subdivision (c)(1), should be one of the factors considered by the court when conducting its balancing test. However, Probate Code section 1516.5 directs the court to weigh a variety of factors when deciding what is in the child's best interests.

Father argues that the court's ruling relied in part on the promise of paternal grandparents to permit continued visitation between Myah and her parents. The court therefore abused its discretion when terminating parental rights, according to father, because the court does not have the authority to enforce postadoption contact. He maintains that this is especially true because paternal grandparents in the past have sometimes prevented visitation between the parents and Myah.

We disagree with father's argument that the lower court conditioned its ruling on the paternal grandparents' permitting the parents to visit with Myah. The court acknowledged the bond between Myah and her parents. The court, however, stated that these bonds did "not rise to the level of overcoming the convincing evidence that shows that the minor would benefit from the termination of parental rights and the stability and peace of mind that would come from a final determination that [paternal grandparents] should become her permanent parents." (Fn. omitted.) The court suggested that the parties

come to a postadoption agreement under Family Code section 8616.5. However, the court did not indicate that its ruling was based on a visitation agreement.

During the trial, the court made it clear that it understood the consequences of terminating paternal rights. When questioning paternal grandparents, the court stated: "What confidence level would either a judge in my position or the parents have—I'm not saying you're required to give a confidence level. I'm just asking what your approach to this is—that they would have if you think it is in their best interest that they, in fact—they would have some reasonable amount of time with the kids given that you really don't seem to have any interest in having them involved in the life of [Myah], except to the extent that the court has ordered?"

Subsequently, when the investigator was testifying, the court stated: "But the research that I've done so far suggests to me that if I grant this petition, the parties that are allowed to adopt become, in effect, the legal parents of the child or children that they are adopting, and they have the exact same rights that a parent would have which means they could say, 'I'm sorry, you don't get to see my child unless I agree,' period, end of discussion." Thus, the court did not make its ruling based on a belief that it could ensure that the parents had continued visitation with Myah. The court, however, was entitled to believe the paternal grandparents' testimony that they intended to have Myah maintain contact with the parents and that they believed it was in Myah's best interest to have ongoing contact with father and mother.

Father also argues that Myah shared a relationship with her older half sibling, and it was in her best interest to preserve that relationship. He states that the maternal grandmother testified that Myah "worships the ground that [her half brother] walks on."

The lower court concluded that Myah's relationship with her half brother was not that significant and the record supports that finding. The half brother is 16 or 17 years old and the maternal grandmother testified that he never knew what to ask Myah when he talked to her on the phone. She testified that Myah saw her brother no more than three times a year and that she never mentioned him while with paternal grandparents. Counsel for Myah stated: "Her relationship with her older brother, given that they were not raised together, haven't spent much time together, was superficially at best [sic]."

Mother argues that the lower court erred in concluding that adoption was preferential to a guardianship. She claims that preference applies to dependency cases where the state is involved, but not in probate guardianship cases. She asserts that nothing in the statute sets forth such a preference.

Mother ignores the discussion of the purposes underlying the enactment of Probate Code section 1516.5 that was discussed by the Supreme Court in *Ann S., supra*, 45 Cal.4th at page 1125. One of the purposes of Probate Code section 1516.5 is to cover situations " 'where a drug addicted mother gives the child in guardianship, hoping to get herself rehabilitated but repeatedly fail[s], creating a situation where the child is in the custody of the guardian for years without being in the foster care system. . . . [A] guardian should be able to adopt the child without having to obtain consent or prove neglect, abandonment, or the mental disorder or mental illness of the parent who gave them [*sic*] guardianship in the first place. [¶] Given the other avenues left available, the sponsor believes that creating this new provision applicable only under the limited circumstances would allow a child to remain in and be adopted into a loving home in which he or she has been living. Adoption would take away any fear that someday his or her birth parent or parents would come back to reclaim him or her.' " (*Ann S.*, at p. 1125, quoting Sen. Com. on Judiciary, Analysis of Sen. Bill No. 182 (2003–2004 Reg. Sess.) as amended Mar. 26, 2003, pp. 8–9.)

Here, father testified that he planned to reclaim Myah sometime in the future, no matter how long it took. This was despite evidence of her stability and happiness in her paternal grandparents' home. The lower court correctly found that the parents were not presently ready nor would they be ready in the foreseeable future to act as full-time parents for Myah and that she deserved to be able to be free of any fear that someday her mother or father would file a petition to dissolve the guardianship.

The trial court in the present case balanced all the relevant factors related to the best interests of Myah. "The 'best interests' standard is 'an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*Adoption of Matthew B., supra*, 232 Cal.App.3d at p. 1263.) In the present case, the parents have not significantly changed the behavior that caused them to agree to give up custody of Myah in 2006. Father testified that he believed paternal grandparents should have guardianship until he was able to care for her. He was asked, "No matter how long that takes?" and he responded, "Correct." Given the minimal progress the parents have made toward being able to care for Myah, this could deprive Myah of any adoptive home and any finality.

Accordingly, substantial evidence supported a determination that it was in Myah's best interests to be adopted by paternal grandparents and the court did not abuse its discretion when it terminated the parental rights of mother and father under Probate Code section 1516.5.

## DISPOSITION

The judgment is affirmed. Parties to bear their own costs.

Kline, P. J., and Richman, J., concurred.

On January 6, 2012, the opinion was modified to read as printed above.