Filed 11/20/13  In re A.A. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re A. A. JR., et al., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B247896 (Super. Ct. Nos. J068463, J068464 J068475) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. M.Z., et al., Defendants and Appellants. | |

M. Z. (mother) appeals from an order terminating her parental rights to her three children: Mikayla T. (eight years old), Alyssa A. (six years old), and Aaron A., Jr. (five years old).  (Welf. & Inst. Code, § 366.26.)[1]  Aaron A., Sr., (father) appeals from an order terminating his parental rights to his two children: Alyssa A. and Aaron A., Jr.  Mother argues that (1) the childrens' appointed counsel had a conflict of

---

[1] Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

interest that requires reversal, (2) the juvenile court abused its discretion in summarily denying her section 388 petition seeking the reinstatement of reunification services; and (3) the juvenile court erroneously failed to apply the beneficial relationship exception to the termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) Father makes no arguments of his own. He merely joins in mother's arguments. We affirm.

*Factual and Procedural Background*

In March 2011 father badly beat mother in the bedroom of their home. The children were in the home at the time of the beating and saw mother's injuries. Mother believed that, immediately prior to the beating, father "had a drug induced psychotic episode." Father said that he had attacked mother because voices in his head told him to attack her. "He denied that the voices he heard [had] ever directed him to inflict harm on the children."[2]

In August 2011 someone reported the family to the Ventura County Human Services Agency (respondent). Alyssa A. had leukemia and was hospitalized. Father was in jail. Mother, who suffered from bipolar disorder and depression, said "that she can't handle her children anymore."

Mother turned 26 years old in August 2011. She admitted being a methamphetamine user since the age of 16 or 17, but claimed that she had last used the drug in January or February 2011. She "was off and on before that." Mother said that she had used methamphetamine while she was pregnant with Mikayla T. and that both she and father had used drugs while the children were in their care.

At a hearing on September 14, 2011, the juvenile court ordered that Alyssa A. be detained out of the home of her parents. When the court announced its ruling, mother said, "Fucking bitch." Five days later, the court ordered the detention of Mikayla T. and Aaron A., Jr. Alyssa A. was three, Mikayla T. was six, and Aaron A., Jr., was two years old.

---

[2] According to the section 366.26 report, father "is now a resident in a State-run psychiatric facility."

At jurisdictional-dispositional hearings in November 2011, the children were declared dependents of the juvenile court and respondent was ordered to provide family reunification services. On December 11, 2011, mother was arrested for being under the influence of a controlled substance in violation of Health and Safety Code section 11550. In January 2012 she entered "Prototypes," an inpatient treatment program. Mother said that, a few days before her entry into the program, she had smoked marijuana. The night before her entry, she had used methamphetamine. On February 28, 2012, Aaron A., Jr., was placed with mother at Prototypes.

A status review report filed in March 2012 noted: "At this time [mother] appears to be fully committed to sobriety and learning how to properly care for her children." The report recommended that mother and father receive six more months of family reunification services.

By the time of the filing of the March 2012 report, mother's conduct had deteriorated. On March 15, 2012, while still residing at Prototypes, mother told another resident that "she wanted to 'kick her ass.' " Four days later, mother said in front of Aaron A., Jr., " 'I want to kick Aaron's . . . ass.' " On June 2, 2012, Prototypes placed mother "in safe programming . . . for foul language and threatening another resident at Prototypes." "Safe programming is when the client is separated from the general population of Prototypes because of being a threat to others." Several residents had come "forward with information that . . . mother had made derogatory remarks and/or had threatened other residents and had used foul language in front of the children residing at Prototypes." On June 7, 2012, mother was discharged from the program. "The reasons for her discharge were [her] inability to follow through with medical care of her son [Aaron A., Jr.], her continuous aggressive behavior, [and her] combative behavior towards staff in the parenting center."

On July 17, 2012, the juvenile court sustained a supplemental petition to remove Aaron A., Jr., from mother's custody. Respondent was ordered to provide reunification services to mother and father. Aaron A., Jr., was placed together with his siblings in the same foster home.

After her discharge from Prototypes, mother did not comply with her case plan. On June 21, 2012, she enrolled in "A New Start for Moms" (ANSFM) as required by the plan. But she tested positive for drugs on September 17, 2012, although her other tests at ANSFM were negative. In September 2012 mother was absent from 12 sessions at ANSFM and told respondent that she was homeless. In September and October 2012 mother failed to appear for four random drug tests to be performed by respondent. According to the case plan, these missed tests are considered to be positive tests. From July 11, 2012, through September 19, 2012, mother did not attend three scheduled visits with her children.

In a status review report dated October 9, 2012, respondent concluded: "Due to . . . mother's lack [of] housing, current homelessness, recent erratic behavior of missing classes and visits with her children, skipped random drug tests, and lack of sober support, there is not a good prognosis that the children will be returned to the care of their mother." Pursuant to respondent's recommendation, the juvenile court terminated reunification services and set the matter for a section 366.26 hearing. Aaron A., Jr., "is thriving in his current placement." He "is especially close to his foster father." Mikayla T. suffers from anxiety because of the domestic violence between mother and father. She feels safe in the foster home and "was able to demonstrate comfort and trust in the [foster] caregivers."

The section 366.26 report praises the foster parents, who want to adopt all of the children: "The prospective adoptive parents . . . have consistently and selflessly cared for these children. They have boldly advocated for Mikayla's mental health needs, scrupulously cared for and managed Alyssa's delicate health care needs and have been able to equally attend to the needs of Aaron Jr. who has now been in the only stable home environment he has ever known in his short four years of life."

On January 22, 2013, mother filed a section 388 petition to reinstate reunification services. On March 27, 2013, immediately prior to the section 366.26 hearing, the juvenile court denied the petition.

4

Several witnesses testified at the section 366.26 hearing.  One of the witnesses was Josephine Figueroa-Lemus, a social worker who supervised visits between mother and the children.  She testified as follows: The foster father drives the children to the location of the visit.  The children refer to him as "Dad" and appear to have a good relationship with him.  The children are happy to see mother.  Mother "is affectionate" with them, and they are affectionate with her.  When the visit ends, the children are excited to see their foster Dad and "typically run to [his] van."  They do not appear to be sad about leaving mother.

The childrens' foster and prospective adoptive mother, K.H., testified that both she and her husband have "bonded" with Mikayla T.  Mikayla T. calls K.H. "Mom" and calls K.H.'s husband "Dad."  K.H. enrolled Mikayla T. in "a specialized program for children that have witnessed domestic violence."  Aaron A., Jr., came to the foster home after Mikayla T.  When he arrived, Mikayla T. told him, " 'You're going to like it here.' "  K.H. invited mother to her home for lunch.  The children were excited to see her and were "fine" when she left.  The children do not talk about mother between visits with her.  If the children become available for adoption, K.H. and her husband are committed to adopting all three of them.

Mother's testimony was brief.  She testified that the children are very excited to see her when she visits them.  They call her "Mommy."

At the conclusion of the section 366.26 hearing, the juvenile court terminated parental rights.  It selected adoption as the permanent plan for the children.

*Conflict of Interest*

Mother contends that the juvenile court committed reversible error by appointing attorney Andrew Wolf to represent the children.  Mother argues that Wolf had a conflict of interest because he had previously represented mother in a dependency proceeding when she was a minor.

Before he was appointed, Wolf disclosed the conflict in open court: "The case will be mine if -- Mother and . . . Father would be required to waive conflict.  I have represented Mother in her dependency years ago.  If there's no waiver of conflict, then

5

the case will go to Ms. Sanderson."  Counsel for mother and counsel for father waived the conflict in the presence of their clients.  Thereafter, neither mother nor father mentioned the conflict issue.

Because mother waived the conflict in the juvenile court, she is precluded from raising the issue on appeal.  " '[A] party is precluded from urging on appeal any point not raised in the trial court.  [Citation.]  Any other rule would " ' "permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not." '  [Citations.]"  [Citation.]'  [Citation.]"  (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)

If mother were permitted to raise the conflict issue, the alleged error would not be reversible because she has failed to show prejudice.  (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601 ["The burden is on the appellant in every case affirmatively to show error and to show further that the error is prejudicial"].)  We reject mother's contention that the alleged error was structural, requiring automatic reversal.  "A court should set aside a judgment due to error in not appointing separate counsel for a child or *relieving conflicted counsel* [in a dependency proceeding] only if it finds a reasonable probability the outcome would have been different but for the error."  (*In re Celine R.* (2003) 31 Cal.4th 45, 60, italics added.)

*Denial of Section 388 Petition*

Mother argues that the juvenile court erred in summarily denying her section 388 petition seeking the reinstatement of reunification services.  " 'Such petitions are to be liberally construed in favor of granting a hearing to consider the parent's request.  [Citations.]  The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing.  [Citation.]'  [Citation.]  'There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.  [Citation.]  If the liberally construed allegations of

6

the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. [Citation.] We review the juvenile court's summary denial of a section 388 petition for abuse of discretion.' [Citation.]" (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

"Whether [m]other made a prima facie showing entitling her to a hearing depends on the facts alleged in her petition, as well as the facts established as without dispute by the court's own file . . . ." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.) In support of the section 388 petition, mother declared: She obtained employment with Carl's Jr. for a minimum of 25 hours per week. She completed a drug and alcohol recovery program, a parenting program, and an anger management program. She continues to "receive services . . . for [her] bipolar condition" and has been regularly taking prescribed drugs "for approximately the past 3 months." She now has "a stable place to live." She is "renting a large room in Oxnard in a house." Mother's declaration concluded: "My children have a close relationship with each other as well as a close relationship with me and it is important they all remain together and that they be able to return to my care. During the period of time that the children have been detained from my care they have each had at least 3 different placements. If the court orders that reunification services be reinstituted I believe that I will be able to provide the children with greater stability than they have had in the past while they have been detained."

The juvenile court found "that there is a showing of changed circumstances." Respondent does not dispute this finding. The juvenile court denied the petition because mother had failed to make a prima facie showing that the reinstatement of reunification services "would be in the best interest of the children because of the stability that they [now] have."

The juvenile court did not abuse its discretion. Mother's conclusionary allegation that she would be able to provide the children with greater stability is insufficient. "[T]here was no showing whatsoever of how the best interests of these

7

young children would be served by depriving them of a permanent, stable home [with the prospective adoptive parents] in exchange for an uncertain future. [Citations.]" (*In re C.J.W.*, *supra*, 157 Cal.App.4th at p. 1081.) Mother's declaration in support of the petition is particularly inadequate in view of her long history of drug use with periods of sobriety followed by relapses. "[R]elapses are all too common for a recovering drug user." (*In re Clifton B.* (2000) 81 Cal.App.4th 415, 423.)[3]

*Beneficial Relationship Exception*

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount. [Citations.] . . . The child has a compelling right 'to [have] a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] Adoption is the Legislature's first choice because it gives the child the best chance at such a commitment from a responsible caretaker. [Citations .]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

"If the court finds that a child may not be returned to his or her parent and is likely to be adopted, it must select adoption as the permanent plan unless it finds that termination of parental rights would be detrimental to the child under one of [several] specified exceptions. [Citations.]" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) During the section 366.26 hearing, mother's counsel told the court, "[T]he only exception available at this point to my client is . . . the beneficial relationship exception." This exception applies if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 336.26, subd. (c)(1)(B)(i).) The parents have the burden of establishing this exception. (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 826; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345.)

---

[3] We do not consider respondent's contention that, even if the juvenile court had erred, the error would be harmless because reunification services previously provided to mother exceeded the statutory 18-month maximum.

" 'To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination.' [Citation.] A beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." [Citation.]' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

### Standard of Review

We review the juvenile court's determination under the substantial evidence standard. (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 642; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 824; *In re Derek W., supra,* 73 Cal.App.4th at p. 827; contra, *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [reviewing court should apply abuse of discretion standard].) We view the evidence in the light most favorable to respondent, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) "The appellant has the burden of showing the [juvenile court's] finding . . . is not supported by substantial evidence. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) "Substantial evidence is reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . . [Citation.]" (*In re Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.)

### Substantial Evidence Supports the Juvenile Court's Finding
### That Mother Failed to Establish the Second Prong of the Exception

The first prong of the beneficial relationship exception is that "[t]he parents have maintained regular visitation and contact with the child." (§ 336.26, subd. (c)(1)(B)(i).) We need not consider the first prong because substantial evidence supports the juvenile court's finding that mother failed to establish the second prong: "the child would benefit from continuing the relationship." (*Ibid*.) "Satisfying the second prong requires the parent to prove that 'severing the natural parent-child

9

relationship would deprive the child of a *substantial,* positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.] Evidence that a parent has maintained ' "frequent and loving contact" is not sufficient to establish the existence of a beneficial parental relationship.' [Citation.]" (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.) [A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)

Viewing the evidence in the light most favorable to respondent, we conclude that a reasonable trier of fact could find that mother's contact with the children had not continued or developed " 'a *substantial,* positive emotional attachment such that the [children] would be *greatly* harmed' " if the relationship were terminated. (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.) When Aaron A., Jr., was living with mother at Prototypes, he "refuse[d] to adhere to [her] directions" and "crie[d] out for the foster family." The section 366.26 report notes that "the children have exhibited signs of distress (anxiety and fear) following" contact with mother. Mother "utilized a visit with the children to discipline [Mikayla T.] to the extent of excess." "[T]he entire visit involved [mother's] repeated reminders of poor choices that . . . Mikayla made." Alyssa A. "has . . . nightmares on the nights following visitation with the mother and when the mother mentions her father." Aaron A., Jr., "has exhibited nightmares and enuresis [bedwetting] following visits with the mother and mention of his father."

Accordingly, "[t]his is not the extraordinary case where an adoption should have been foreclosed by the exception provided in section 366.26, subdivision (c)(1)(A) [now (c)(1)(B)(i) ]." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1352.) "The juvenile court properly found there was no beneficial parental relationship

10

sufficient to overcome the statutory preference for adoption," especially since the foster parents are committed to adopting all three children.  (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 644.)

*Disposition*

The judgment (order terminating parental rights and selecting adoption as the permanent plan) is affirmed.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

12

Ellen Gay Conroy, Judge

Superior Court County of Ventura

_____

Marisa Coffey, under appointment by the Court of Appeal, for Mother M. Z., Appellant.

Amy Z. Tobin, under appointment by the Court of Appeal, for Father A. A., Appellant.

Leroy Smith, County Counsel, County of Ventura and Alison L. Harris, Assistant County Counsel, for Respondent.