Filed 5/28/14  In re E.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059996 |
| Plaintiff and Respondent, | (Super.Ct.No. J248085) |
| v. | OPINION |
| V.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lily L. Sinfield, Judge.  Affirmed with directions.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

V.V., the biological father of E.R., appeals from an order of the juvenile court denying his Welfare and Institutions Code[1] section 388 petition and terminating his parental rights to E.R. who was born in February 2013.  V.V. also asserts a violation of the Indian Child Welfare Act of 1978 (ICWA)[2] notice requirements.

The record demonstrates that V.V. dated mother briefly from April to June 2012. In August or September 2012, V.V. knew mother was pregnant but he ceased having any contact with her.  In April or May 2013, he knew E.R. had been born.  Nevertheless, V.V. did not come forward to claim paternity until mid-June 2013.

We hold the juvenile court properly denied V.V.'s section 388 petition and terminated parental rights.  We remand, however, ordering the juvenile court to comply with ICWA notice provisions.  Otherwise, we affirm the judgment.

---

[1]  All further statutory references are to the Welfare and Institutions Code.

[2]  25 United States Code section 1901 et seq.

II

FACTUAL AND PROCEDURAL BACKGROUND

*A. Detention and Pretrial Proceedings*

CFS[3] filed an original dependency petition in February 2013. When E.R. was born that month, both he and the mother tested positive for methamphetamine. The petition alleged failure to protect, no provision for support, and abuse of a sibling. (§ 300, subds. (b), (g), and (j).) Mother had two older children, ages two and four years old, being placed for adoption. Additionally, the petition alleged that father's identity and whereabouts were unknown. Mother said father was a Marine named "James"— whom she had been with "a couple of times." Father was still unknown in March 2013. A declaration of due diligence, filed March 27, 2013, stated that CFS could not locate father.

At the contested jurisdiction and disposition hearing on March 27, 2013, mother denied any Indian ancestry and the court ruled ICWA did not apply. The court sustained the dependency petition and denied mother reunification services. The court found that "James" was an alleged father who was not entitled to reunification services. The court set a section 366.26 hearing for July 25, 2013.

CFS filed a section 366.26 report in July 2013, recommending termination of parental rights and adoption placement for E.R. CFS disclosed that V.V. had visited the

_____

[3] Children and Family Services, County of San Bernardino.

3

CFS office in June 2013 claiming possible paternity. V.V. said he had been dating mother when she became pregnant but they had lost contact. He asked to have a DNA test.

The infant E.R. was bonded with his foster parents—the prospective adoptive parents—and developmentally on target although he displayed the effects of prenatal drug exposure. The foster parents were a stable young married couple. The foster father was employed on a Marine base where they lived in base housing.

V.V. appeared at the hearing on July 25, 2013, and informed the court that his father and his uncles are registered members of the Soboba Indian tribe and his paternal grandfather was one-quarter Cherokee. The hearing was continued for further proceedings regarding paternity.

V.V. executed a statement regarding parentage requesting DNA testing. In the paternity questionnaire, V.V. stated he was not married to mother. He had not participated in paternity testing, he was not at the hospital when E.R. was born, and he was not on the birth certificate. He was not paying child support. In June 2013, he was told he was the child's father and he believed he was the father. The court ordered paternity testing.

In September 2005, CFS filed an ICWA declaration of due diligence, in which it recorded the response of the Soboba tribe of Luiseno Indians that the child was not enrolled or eligible for enrollment and the tribe would not intervene. No mention was made of notice to a Cherokee tribe.

4

The DNA test identified V.V. as the biological father. CFS filed an addendum report stating V.V. is "merely [the] biological father; it is not in [E.R.'s] best interest to provide services." CFS recited the history of V.V. coming to its office in June 2013, claiming to be the father and asking for a DNA test. On April 29, 2013, however, there was a Facebook posting, comparing photos of both V.V. and E.R. when they were born. During visitations and at court hearings, V.V. had little interaction with E.R. CFS believed that V.V. wanted to help mother but did not seek to have relationship with E.R. V.V. had been arrested for being under the influence and disorderly conduct. He had a criminal history of five theft and burglary offenses in 2012 and 2013.

E.R. had sensory and digestive problems stemming from his prenatal drug exposure. The foster parents were strongly committed to caring for E.R. and his special needs.

At the hearing on September 5, 2013, the court found V.V. was the biological father but denied visitation.

B. *Section 388 Petition*

On September 18, 2013, V.V. filed a section 388 petition asking the court to order reunification services. The petition explained that V.V. had not known he was the father until June 2, 2013, when mother told V.V.'s mother he was the father. Mother had warned V.V. that he could only visit E.R. under restrictions against holding or touching the baby. V.V. disclaimed any present relationship with mother. It was V.V.'s sister who had posted the baby pictures of E.R. and V.V. on Facebook. V.V. wanted to unify

with E.R. with his own mother's help until he was actually capable of acting in a parental role.

CFS responded that V.V. must have suspected he was the father earlier and certainly after he had notice from the Facebook posting of the baby photos. CFS described V.V. as an unfit parent because of his substance abuse, his unstable housing, and his criminal activity. CFS denied there was any attachment or bond between father and son.

*C. The Contested Section 366.26 Hearing*

At the hearing on November 7, 2013, V.V. testified he had a sexual relationship with mother from April to June 2012 and they did not use birth control. In August or September 2012, when mother was about three months pregnant, she said V.V. might or might not be the father but then they stopped talking to one another. In April or May 2013, V.V. saw the baby pictures of E.R. and V.V. his sister had posted on Facebook. Although V.V. thought he was the father, he did not try to contact mother. He did not see mother again until June 2013 after V.V.'s mother said he was probably the father and he found out E.R. was in foster care. V.V. immediately visited the CFS office to see what could be done to recover E.R.

V.V. was subject to a warrant for failure to appear in October 2012. He was arrested on May 26, 2013, for being drunk in public and disturbing the peace. He was not employed. He was not prepared to assume custody of E.R. because he was living in a group home, receiving counseling, and trying to find a job.

6

The court denied the section 388 petition, finding V.V. could not show he could assume responsibility for E.R. and he did not qualify as a presumed father. The court also found it was in the best interests of the child to be adopted and the court terminated parental rights.

III

DENIAL OF THE SECTION 388 PETITION

AND TERMINATION OF PARENTAL RIGHTS

V.V. argues the juvenile court erred by denying the section 388 petition based on its finding that he was not a presumed father. V.V. protests that the court violated his rights to due process and equal protection by denying him the rights of a presumed father pursuant to *Adoption of Kelsey S*. (1992) 1 Cal.4th 816, 849. Further, the juvenile court had to conclude that V.V., as a "quasi-presumed" father, was an unfit parent before terminating his parental rights and the court violated his rights to due process by failing to do so.

A biological father is a "natural" father. A man who holds out a child as his own and receives the child into his home is a "presumed" father even if he is not a natural father. (*In re Jerry P*. (2002) 95 Cal.App.4th 793, 801-802.) Under the dependency statutes, presumed fathers have far greater rights than biological fathers. (*In re Zacharia D*. (1993) 6 Cal.4th 435, 448-449 (*Zacharia D.*).) A presumed father is entitled to reunification services under section 361.5 and custody of his child. (*Zacharia D.,* at p. 451.) The presumed father must prove his status by a preponderance of the evidence.

7

(*Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 585-586.)  We employ a mixed standard of review based on substantial evidence and independent judgment.  (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.)

Under Family Code section 7611, "a man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he both 'receives the child into his home and openly holds out the child as his natural child.'  [Citation.]"  (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051, italics omitted, citing Fam. Code, § 7611, subd. (d).)  In order to demonstrate a full commitment to his parental responsibilities, the biological father must immediately attempt to assume full parental responsibilities as soon as he reasonably knows of the pregnancy.  (*In re Julia U.* (1998) 64 Cal.App.4th 532, 541; *Adoption of Kelsey S., supra,* 1 Cal.4th at pp. 848-849.)

The Supreme Court in *Kelsey S.* held that Civil Code "section 7004, subdivision (a) and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.  If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities--emotional, financial, and otherwise--his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent."  (*Adoption of Kelsey*

8

*S., supra*, 1 Cal.4th at p. 849, italics omitted.)  Hence, a man may attain presumed father status even if the mother thwarts his efforts if he at least initiates prompt legal action to seek custody of the child.  (*Id.* at pp. 825, 849; see also *Zacharia D.*, *supra,* 6 Cal.4th at p. 450, fn. 19.)

This case presents a different circumstance than *Kelsey S.* given the belated stage of the dependency process in which the presumed father issue was raised:  "'[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.'  [Citation.]  'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.'  [Citation.]  'The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue.  Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.'  [Citation.]"  (See *Zacharia D., supra*, 6 Cal.4th at p. 447.)

"*Zacharia D.* held that biological fathers who appear after the end of any reunification period must file a section 388 petition to revive the issue of reunification services.  [Citation.]"  (*In re Vincent M.* (2008) 161 Cal.App.4th 943, 956.)  The court noted that it was not presented with the issue of a father who comes forward "'*early in the dependency process*, and who displays a commitment consistent with the standard set forth in *Kelsey S.*'" but is thwarted from achieving presumed father status by the mother.  (*Id.* at p. 958.)

9

*Vincent M.* followed *Zacharia D.* and also held that a biological father's only remedy to assert paternity and receive reunification services after the expiration of the reunification period is to file a section 388 petition to modify. (*In re Vincent M., supra,* 161 Cal.App.4th at pp. 954-955.) *Vincent M.* expressly stated, "The section 388 petition will not be granted unless there are changed circumstances or new evidence demonstrating it is in the child's best interest to grant reunification services or custody." (*Id.* at p. 955; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

The juvenile court did not abuse its discretion by refusing to find that V.V. was the presumed father. V.V. had unprotected sex with mother and did not try to determine whether this had resulted in her pregnancy. V.V. waited until four months after E.R. was born before making a request for custody. There is no evidence that V.V.'s living situation, his ability to care for E.R. or his background would promote the best interests of the child. Nothing in the record supports that V.V. should be granted *Kelsey S.* status. (*In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1117.) The juvenile court did not abuse its discretion by concluding that removing E.R. from his loving foster family was not in his best interests.

V.V. further contends that the juvenile court could not terminate his parental rights at the section 366.26 hearing because his rights could not be terminated unless there was

a finding that he was an unfit parent and his rights to due process were violated. After denying the section 388 petition and concluding V.V. was not entitled to presumed father status, V.V. was a mere biological father. A mere biological father's parental rights may be terminated in the absence of an unfitness finding, without violating due process. "'[P]arental rights may be terminated based solely upon the child's best interest and without any requirement for a finding of detriment or unfitness . . . .' [Citations.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 933-934.) There was no due process violation.

IV

ICWA NOTICE

Respondent concedes that the social worker in this case neglected to send ICWA notice to the Cherokee tribe and omitted to include the name of V.V.'s paternal uncle in the notice given to the Soboba tribe. CFS had a duty to give such full and complete notice as information allows. (*In re S.M.* (2004) 118 Cal.App.4th 1108, 1116; *In re Louis S.* (2004) 117 Cal.App.4th 622, 631.) Therefore, we agree with respondent's suggestion that the case be remanded to juvenile court to correct the ICWA notice.

V

DISPOSITION

We remand, ordering the juvenile court to comply with ICWA notice provisions.

Otherwise, we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


HOLLENHORST
       Acting P. J.


RICHLI
       J.