Filed 2/15/24  In re Remington W. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re REMINGTON W., a Person Coming Under the Juvenile Court Law. | |
| KAITLYN W., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SONOMA COUNTY, <br><br> Respondent; <br><br> SONOMA COUNTY HUMAN SERVICES DEPARTMENT, <br><br> Real Party in Interest. | A169066 <br><br> (Sonoma County Super. Ct. No. 6635DEP) |

Kaitlyn W. (mother) petitions this court for extraordinary relief from the juvenile court's order, at the 12-month review hearing, terminating her reunification services and setting a permanency hearing pursuant to Welfare and Institutions Code section 366.26 for her child, Remington W.[1]  Mother contends the juvenile court erred because (1) she was not provided reasonable services and (2) there was a substantial probability Remington could be

---

[1] All statutory references are to the Welfare and Institutions Code.

returned to her home by the 18-month review hearing.  We reject mother's contentions and deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    *Original Petition*

In July 2022, the Sonoma County Human Services Department (Department) filed a petition, pursuant to section 300, subdivisions (b) and (g), to establish dependency jurisdiction over six-day-old Remington based on mother's chronic drug abuse, including mother's positive tests for amphetamine and prescribed methadone at the time of Remington's birth.[2] The Department's July 18, 2022 detention report recommended detaining Remington with mother under supervision.  It explained that mother, who was 29 years old, had a history of substance abuse, beginning when she was 17 years old, with periods of sobriety and relapse.  Approximately a year before Remington's birth, mother began a methadone maintenance program through Santa Rosa Treatment Program, Inc. (SRTP), and continued to receive weekly counseling and random drug testing through the program. Mother explained that her last use of methamphetamine was a " 'slip-up' " which she immediately regretted.  The Department reported that Remington was born preterm, weighing five pounds nine ounces.  Remington tested negative for all substances at birth, did not show any signs of withdrawal symptoms, and was feeding well.[3] The Department developed a safety plan

---

[2] The petition also included allegations regarding father's substance abuse and incarceration.  At the 12-month review hearing, the juvenile court also terminated father's reunification services.  However, father has not filed a writ petition, and therefore we need not summarize facts related to father.

[3] The Department's March 29, 2023, status review report states that Remington's urine toxicology test was positive for methamphetamine and opioids at birth.  This is inconsistent with the Department's statement in its

2

with mother requiring her to maintain her sobriety, provide drug test results, and develop a support system to allow for supervision and monitoring of Remington while in mother's care.

At the July 19, 2022, detention hearing, over the objection of counsel for Remington, the juvenile court placed Remington with mother.

At the August 17, 2022, jurisdiction/disposition hearing, the juvenile court sustained the petition, declared Remington a dependent, and ordered reunification services for mother.

## II.   *Supplemental Petition and Jurisdiction/Disposition Hearing*

On September 1, 2022, the Department applied for a protective custody warrant for Remington after learning mother tested positive for fentanyl on August 29, 2022.  The juvenile court issued the warrant, and Remington was removed from mother's care and placed in emergency foster care.

On September 6, 2022, the Department filed a supplemental petition alleging that mother tested positive for fentanyl on August 29 while Remington was in her care.  The Department's September 7, 2022 detention report recommended that Remington be removed from mother.  The juvenile court adopted the Department's recommendation.

The Department's report prepared for the jurisdiction/disposition hearing on the supplemental petition stated that mother continued to deny substance abuse and wanted Remington returned to her care.  Mother met with a counselor at Drug Abuse Alternatives Center (DAAC) for perinatal day treatment on September 20, 2022, but she did not complete the assessment. Mother was asked to drug test while there but claimed she " 'could not pee.' " Mother reported to the DAAC counselor that her last drug use was in June

July 18, 2022 detention report, and the record does not explain the inconsistency.

3

2022. The Department's report stated concern about mother's pattern of avoiding random drug testing, minimizing her substance abuse issues, and lack of insight into her behavior and the risk it posed to her child.

The Department further reported on its discussions with Dr. Erin Lund, who treated Remington at Santa Rosa Community Health. Dr. Lund reported that mother brought Remington to some appointments for weight checks and newborn visits, but she also canceled or missed multiple appointments. As of Remington's August 30, 2022 appointment, she weighed seven pounds five ounces. She was in " 'the 3rd percentile' " for weight, which might have been due to drug exposure. Dr. Lund recommended that she be closely monitored for weight gain. After Remington was removed from mother's care, she was seen by Dr. Scott Holmes at Petaluma Health Center. Dr. Holmes diagnosed Remington with poor weight gain, positional plagiocephaly (head flatness on the left side), a minor lip tie and stiffness in her legs and neck.

On September 29, 2022, the juvenile court sustained the supplemental petition, removed Remington from mother's care and ordered reunification services. Mother's reunification services included substance abuse services through DAAC, parent mentoring, housing support, drug testing, and individual and group therapy.

III.  *Six-month Review*

In advance of the six-month review hearing, the Department submitted a report recommending continuation of reunification services. Over the six-month period, mother inconsistently engaged in substance abuse treatment. She delayed completing the intake process for outpatient treatment with DAAC, and she tested positive for methamphetamine and fentanyl on multiple occasions. The DAAC program coordinator recommended inpatient

4

treatment at Women's Recovery Services (WRS). When a space became available at WRS, mother told the Department social worker that she wanted to attend a different program because WRS was too close to her home. On December 8, 2022, mother began treatment at Align Recovery Centers. A week later, she was asked to leave the program. The program's director confirmed to the Department social worker that mother had been expelled but did not provide further details.

The Department encouraged mother to attend WRS. Mother delayed completing intake at WRS for several weeks but began the program on January 17, 2023. She left the program after five days. WRS offered mother the option to return, but she initially chose not to do so. After several weeks of discussions with WRS's program staff and encouragement from the Department, mother reentered WRS on February 20, 2023, and began a detoxification program. The next day, mother's roommate discovered a plastic straw and lighters in mother's hygiene bag. WRS staff also found a hidden cell phone mother was using to communicate with people suspected of selling drugs from mother's home. WRS considered discharging mother from the program but decided to allow her to stay. WRS reported that since the initial incident, mother's treatment was going well. Although it was early in the treatment program, WRS staff were optimistic about mother's ability to progress in recovery.

The Department made referrals to the Lomi Psychotherapy Clinic for mother in September 2022, and the clinic left messages for mother, but mother did not respond. Mother was discharged from the SRTP methadone clinic in January 2023, and WRS arranged for her to enroll in the Redwood Empire Addictions Program (REAP), where she could receive methadone maintenance treatment. Mother was given referrals for parent education

5

services through Child Parent Institute (CPI) and links to its remote mothers group, but mother did not engage in parent education services during this period. The Department explained that it did not give mother a referral to domestic violence prevention classes because it did not appear that domestic violence was an issue for the family.

The Department reported that Remington had been put on a high-calorie diet due to medical concerns of a failure to thrive. She was fitted for a corrective helmet in January 2023 due to an abnormal head shape. Also in January 2023, Remington received a laser procedure to correct a severe lip tie, severe buccal ties, and a moderate tongue tie. Her feeding improved after the procedure, and she was gaining weight at a healthier rate. Remington received services through North Bay Regional Center's Early Start Program to improve her cognitive, motor and sensory skills. She received weekly physical therapy.

Mother had supervised weekly in-person visits with Remington until December 2022, when the social worker required a negative drug test before in-person visits. Virtual visitation was arranged in late February 2023, and weekly in-person visits resumed on February 28, 2023. Remington appeared comfortable and happy during visits.

Minor's counsel contested the Department's recommendation to continue reunification services, and the six-month review hearing was continued to May 15, 2023. The Department submitted an addendum report in advance of the six-month hearing, which again recommended continuing reunification services for mother. Mother submitted a witness and document disclosure for the hearing, which included supportive letters from her service providers regarding her progress in treatment. In April 2023, mother

requested to enter Dependency Drug Court (DDC), and her request was approved on April 24, 2023.

At the continued six-month review hearing, the juvenile court found mother made minimal progress toward alleviating the causes necessitating the placement and continued reunification services for another six months.

## IV. *Twelve-month Review*

The Department's report in advance of the 12-month review hearing recommended termination of reunification services and the setting of a section 366.26 hearing. The Department reported that on May 21, 2023, mother successfully completed WRS's 90-day residential treatment program. However, mother had previously reported to the juvenile court that she would remain in the WRS residential program for the advised 120 days. After leaving WRS's residential program, mother enrolled in the DAAC perinatal program and in WRS's aftercare program. She moved into Athena House, a sober living environment. Ten days after mother moved to Athena House, she was discharged from the program because of a shoplifting incident during an outing with other Athena House residents. Minors were present at the time of the shoplifting incident. Mother was also discharged from DAAC's perinatal outpatient program and the WRS aftercare program. Mother expressed remorse to the Department social worker for the shoplifting incident and stated that she would not have shoplifted if her daughter had been in her care.

Mother continued to participate in DDC, where she attended three classes per week with the same case manager she worked with at DAAC. The case manager advised the Department that she believed mother needed a higher level of care, such as residential treatment. The case manager explained her belief was based on the shoplifting incident, mother's not being

fully engaged in classes, and mother's socializing with peers known to be actively using drugs.  The Department social worker reported similar concerns regarding mother's lack of engagement in classes.  Mother was unable to describe her classes to the social worker, and she told the social worker to ask the DDC program director for the names of the classes.

Mother was attending weekly 12-step support groups, and her sponsor reported that she was working on step 4.  She continued receiving methadone support through REAP.

The Department reported that after mother left residential treatment at WRS, she tested positive for norfentanyl twice in May 2023 and twice in June 2023.  She also tested positive for codeine twice in June 2023.  Mother told the Department social worker that she was not actively using and she believed the positive tests for norfentanyl were due to her still metabolizing fentanyl she used in February 2023.  Mother believed her positive test for codeine was due to a poppy seed bagel.

The Department reported that Remington continued to receive physical therapy and play therapy.  She had delays in gross motor, fine motor, receptive language, social/emotional behavior, and cognitive skills.   In August 2023, Remington was seen by a pediatric neurologist due to her decreased right-side gross motor movement and strength.  The neurologist found no structural abnormalities to her head and determined it was unlikely structural brain differences were causing motor delays or asymmetries.  Continued physical therapy was recommended.

During the review period, mother had two supervised visits per week with Remington.  The visits fluctuated between fully supervised to lightly supervised.  The Department reported mother was playful and attentive to Remington, but it continued to believe supervision was necessary because

8

mother did not consistently respond to the child's cues and needs. For example, mother noted when Remington was tired but continued to play with her instead of letting her nap. The Department was also concerned that mother did not consistently or thoroughly massage Remington for her muscle stiffness as her physical therapist prescribed. The Department reported that at times Remington appeared happy to see mother, smiling and reaching out to her, but at other times Remington cried and had difficulty transitioning away from her resource parent.

Mother was referred to in-home parent education through CPI in August 2023. Mother delayed beginning the visits for several weeks. After her first visit, on September 5, 2023, mother canceled the next two visits. The September 18, 2023 visit was shortened due to mother's having a scheduling conflict. Mother attended the next CPI visit, on September 26, 2023, during which she completed her registration and discussed her expectations for herself and her child.

Mother moved into InterFaith Shelter Network's transitional housing on September 27, 2023, and was working with her case manager to obtain safe and permanent housing.

The Department recommended termination of reunification services. It believed mother had not progressed consistently in her treatment programs and had not shown she was capable of managing unsupervised visits with Remington. The Department was also concerned that mother had positive drug tests as recently as June 2023.

At the contested 12-month review hearing on November 3, 2023, the Department's social worker testified that the Department's recommendation was based on mother's inconsistency and lack of substantive change over time. Specifically, the social worker noted mother's decision to complete only

9

the 90-day WRS residential program, rather than the recommended 120-day program, and her being discharged from the DAAC perinatal and WRS aftercare programs due to shoplifting. Based on mother's history of starting and then changing programs, the social worker was unable to conclude that there was a substantial probability that mother would complete the drug portion of her case plan if reunification services were extended for six more months. The social worker explained that mother continues to be drug tested randomly by the Department and that she also received drug tests through other programs, including REAP, the methadone clinic. Her last positive drug test by the Department was in June 2023.

The social worker summarized the various services the Department offered mother during the dependency proceeding, including a referral to individual therapy through the Lomi clinic, individual and group therapy through WRS, group therapy through DAAC, parenting education through CPI, and supervised visitation. The social worker testified about Remington's medical issues, including her physical therapy sessions. Mother attended the sessions via remote video; however, since the sessions began in April 2023, mother missed five appointments. Mother was not always attentive during the sessions she did attend. The social worker was concerned that mother had not demonstrated she understood the status of Remington's development and health.

Amanda Cream, the facilitator of DDC, testified on behalf of mother. She explained that DDC offered a voluntary treatment program for individuals with active child protection cases who were receiving reunification services. The program typically lasted one year and required participants to attend treatment and self-help meetings, participate in drug testing, work with a sponsor or mentor, meet weekly with Cream, and have

10

regular reviews before a judge.  Cream testified that mother had been in compliance with the DDC program since she enrolled; she had reached the third phase of the program and was expected to complete the program in about six months.  Cream testified to mother's progress in seeking help and support, advocating for herself, and setting boundaries with people who are unhealthy or using drugs.  Cream was aware of mother's positive tests for norfentanyl, but Cream understood this was not uncommon in people who had been long-term users of fentanyl.  Cream was not concerned about possible relapse because mother's behaviors did not indicate active drug use. Mother's recent drug tests had been negative, including during the time period after she was discharged from her housing and aftercare program due to her shoplifting.  Cream believed it was significant that mother was able to maintain her sobriety while handling the challenges of seeking new housing and treatment programs.  When asked whether Remington would be safe if placed in mother's care, Cream qualified that the issue was not her area of expertise.  She ultimately testified that mother needed ongoing supervision to provide for Remington's safety and was not yet ready to care for her daughter full-time.  However, Cream believed mother was on her way to reaching that goal.

Mother testified about the residential treatment program she completed and the outpatient programs in which she continued to participate through DDC and DAAC.  She went to individual therapy with a therapist at the Lomi clinic from September 2022 to June 2023.  The therapy was intended to be weekly, but mother did not consistently attend until she stopped using drugs.  In June 2023 the therapist left the clinic, and mother understood she needed a new referral to see a new therapist.  She asked the social worker multiple times for a new referral and only recently received

one.  As a result, she did not have individual therapy from June to October.

Mother also testified about Remington's medical history, including her need

to wear a corrective helmet and her lip tie issue. Mother attended a recent

appointment with a neurologist to discuss possible tests that might be needed

to determine if Remington was having seizures.  Mother has had difficulty

obtaining Remington's medical records, but she recently obtained physical

copies.  Mother missed some of Remington's regular medical appointments

because she was not told about them.  Mother attended Remington's physical

therapy appointments and explained the muscle massages the therapist

prescribed.

Following the contested 12-month review hearing, the juvenile court

terminated reunification services and set a section 366.26 hearing.

## DISCUSSION

Mother challenges the juvenile court's termination of reunification

services and the setting of the section 366.26 hearing on the grounds that the

juvenile court erred in finding that the Department provided reasonable

services.  She also contends that the juvenile court erred in finding it was not

substantially likely that Remington will be returned to mother's care by the

18-month date.

## I.  *Statutory Framework*

For a parent of a child under three years of age at the time of removal,

the statutory scheme for providing reunification services establishes "three

distinct periods and three corresponding distinct escalating standards . . . ."

(*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845.)  During the first

period, from the jurisdictional hearing to the six-month review hearing,

services are "afforded essentially as a matter of right," subject to certain

statutory exceptions not relevant here.  (*Ibid.*)  During the second period,

12

from the six-month review hearing to the 12-month review hearing, "a heightened showing is required to continue services." (*Ibid.*) The juvenile court must continue services only if it finds that "there is a substantial probability that the child . . . may be returned to their parent . . . within six months or that reasonable services have not been provided . . . ." (§ 366.21, subd. (e)(3).) During the third and final period, from the 12-month review hearing to the 18-month review hearing, services are "disfavored." (*Tonya M.*, at p. 845.) The juvenile court shall continue the case "only if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent" within the extended review period or if it finds reasonable services have not been provided. (§ 366.21, subd. (g)(1).) In order to find a substantial probability of return, the juvenile court is statutorily required to find that the parent has (1) consistently and regularly contacted and visited with the child; (2) made significant progress in resolving the problems that led to the child's removal; and (3) demonstrated the capacity and ability to complete his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs. (§ 366.21, subd. (g)(1)(A)–(C).)

## II.  *Reasonable Services*

Before the juvenile court may set a section 366.26 hearing, it must find by "clear and convincing evidence that reasonable services were provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(c)(ii).) We review this finding for substantial evidence, taking into account the "clear and convincing" standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.) Thus, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid.*) We review the record in the

light most favorable to the judgment below with due deference to the juvenile court's credibility determinations, resolution of conflicts in the evidence, and reasonable inferences that may be drawn from the evidence.[4] (*Id.* at p. 996.)

We find substantial evidence supports the finding that the Department provided reasonable reunification services to mother. Mother was provided with multiple referrals and services throughout the proceeding, including residential treatment at WRS, substance abuse services through DAAC, WRS aftercare treatment after she completed the 90-day residential treatment, drug testing, parenting education, individual therapy, housing assistance, supervised visitation, and regular contact with the Department.

Mother highlights several areas in which she contends the Department failed to provide reasonable services. She argues the Department failed to consistently provide monthly in-person meetings between the Department social worker and mother. She claims the then current social worker testified that the Department had no in-person contact with mother in June and July. The social worker's testimony is less definitive than mother asserts. She stated she would need to review the delivered service logs. The delivered service logs for this period indicate that a Department social worker met in person with mother on June 30, 2023, and then again on August 2, 2023. Mother also refers to the social worker's testimony that she did not meet with mother in October 2023. The social worker explained that her scheduled

---

[4] Mother contends that the juvenile court erred by not applying the clear and convincing evidence standard. The record belies this claim. The juvenile court specifically stated on the record that "[t]he Court has to determine at a 12-month review, did the Department provide reasonable services or offer reasonable services by clear and convincing evidence. [¶] Quite frankly, all parties demonstrated that the Department did just that, they provided reasonable services." In addition, the juvenile court's findings and orders also reference the clear and convincing evidence standard.

14

October meeting with mother had to be postponed because the social worker was ill; however, the social worker contacted mother by telephone during this period.

Mother further contends her referrals for a parenting mentor and a therapist were delayed. As to the parenting mentor, the record indicates mother was offered parenting education services through CPI during the initial six-month review period, but she did not engage. Mother later began working with a parent mentor from CPI, in April 2023, while she was at WRS, and she continued to engage in CPI's services through October 2023. In August 2023 mother received another referral for parent education, and after some delays and cancelations of visits by mother, mother began engaging in visits with her parent mentor. Regarding individual therapy, mother testified that she participated in therapy with a therapist from the Lomi clinic "on and off" from September 2022 to June 2023, when the therapist left the clinic. She then asked the Department for a new referral multiple times, but she did not receive a new referral until October 2023. The Department social worker testified that mother's original referral to Lomi remained open. In addition, mother received individual and group counseling at WRS. It appears there may have been some miscommunication regarding how mother was to continue individual therapy after her assigned therapist left the Lomi clinic. However, given the multiple services provided to mother during the dependency proceeding, we do not find that a delay in securing a new therapist requires reversal of the juvenile court's finding that the Department provided reasonable services. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697 [" 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances' "].)

15

Mother's claim that the Department provided inadequate housing assistance is not supported by the record. The Department assisted mother by providing her a referral to InterFaith assisted housing, referring her to WRS's residential treatment program, communicating with her about her plan to live at Athena House after she completed the residential treatment, and then confirming that mother secured housing through InterFaith in September 2023 after she was discharged from Athena House.

Mother also complains that she did not receive a referral for domestic violence counseling. The Department's March 29, 2023, report in advance of the six-month review hearing states that a referral was not made because there was little information that domestic violence was a safety threat for the family and the Department wanted mother to focus on her substance abuse treatment. Under the circumstances of this case, we reject mother's argument that the Department failed to provide reasonable services because it did not provide a referral for domestic violence counseling. (*In re T.G., supra*, 188 Cal.App.4th at p. 697.)

Mother's claim that the Department's communication with mother's substance abuse providers was inadequate is also not supported by the record. Mother cites to the then current social worker's testimony at the November 3, 2023, contested 12-month review hearing. The social worker stated that since she was assigned to mother's case on September 20, 2023, she spoke with mother's DDC counselor once and spoke with mother's DAAC counselor twice. The social worker testified that she did not know if the previous social worker spoke with mother's DAAC counselor; however, the Department received and reviewed all of the DDC reports. The record also includes documentation of contacts between the Department social workers and mother's WRS caseworker, and between the Department social worker

16

and the directors at Athena House, where mother lived after completing the residential treatment at WRS.

Finally, mother asserts that the social worker's belief that mother would not succeed in reunification is not a defense to providing reasonable services. As discussed *ante*, we find substantial evidence supports the juvenile court's finding that the Department provided reasonable services. In addition, we are unpersuaded by the evidence mother cites in support of her argument. Mother claims that the Department social worker testified that at some point between September and October, mother's visitation was reduced from four hours to two hours because of the Department's recommendation to terminate reunification services. However, the social worker's initial testimony on this issue was that the reduction in visitation was also due to the Department's resources and to accommodate schedules. Later in her testimony, the social worker clarified that the reduction in visitation hours was not due to the Department's recommendation to terminate services but was done in order to accommodate mother's treatment and work schedule and the Department's resources.

## III. *Substantial Probability of Return by 18 Months*

Mother contends the juvenile court erred in finding there was no substantial probability of reunification within 18 months. She argues the evidence supports a finding that she meets the section 366.21, subdivision (g)(1) statutory requirements for a finding that there is a substantial probability that Remington will be returned to her by the 18-month date, which is in March 2024. Specifically, mother argues she has maintained regular contact and visitation with Remington (§ 366.21, subd. (g)(1)(A)); she has made significant progress in her case plan (§ 366.21, subd. (g)(1)(B)); and she has demonstrated the capacity and ability to complete the

17

objectives of her treatment plan and to provide for Remington's safety, protection, physical and emotional well-being, and special needs (§ 366.21, subd. (g)(1)(C)).

We agree with mother that she had consistent and regular visitation with Remington throughout the dependency proceeding. The record also includes evidence that mother has made progress in treating her drug addiction, particularly the testimony of the DDC program director. However, mother's progress is fairly recent and not without recent setbacks. She completed the WRS 90-day residential treatment program on May 21, 2023. Shortly thereafter, mother tested positive for norfentanyl and codeine, in May and June 2023. Then, in August 2023, mother was discharged from her sober living facility after a shoplifting incident. The juvenile court recognized at the November 3, 2023 hearing that mother had more recently been making progress in addressing her addiction problem. However, it found that there was not a substantial probability of reunification by March 2024. In making this finding, the juvenile court noted that mother had suffered from addiction for years and had only been clean and sober since June 2023.

We uphold a juvenile court's findings supporting termination of reunification services if supported by substantial evidence. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.) "When determining whether substantial evidence is present, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. [Citation.] We merely determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact. [Citation.] Substantial evidence is 'reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . .' [Citation.] The appellant must show the evidence is

18

insufficient to support the trial court's findings." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.)

We find substantial evidence supports the juvenile court's finding that there is not a substantial probability of reunification by March 2024. Although mother presented evidence that she had been sober since she entered treatment on February 20, 2023, she acknowledges the drug tests from May and June 2023 indicating positive results for norfentanyl and codeine. Mother denied using drugs during this period and offered alternative explanations for the positive tests. However, on review, we do not resolve conflicts in the evidence or assess witness credibility. (*Adoption of Myah M., supra*, at p. 1539.) The record supports a finding that although mother's progress in resolving her addiction was continuing, it was not significant enough that there was a substantial probability of reunification by March 2024.

The record also includes evidence to support a finding that mother had not demonstrated the capacity and ability to provide for Remington's safety, physical and emotional well-being, and special needs. The juvenile court noted that Remington has many medical issues. Mother attended some of Remington's medical appointments, but not all. There was also testimony from the social worker that mother lacked a full understanding of Remington's development and health. During supervised visitation, mother was observed to be attentive and playful with Remington but did not consistently recognize Remington's cues. Nor did mother demonstrate an awareness of how to massage Remington for her muscle stiffness as prescribed by the physical therapist. After Remington was removed from mother's care in September 2022, mother's visitation was supervised, and the Department did not believe mother had shown the ability to safely and

appropriately care for Remington without supervision.  Sufficient evidence supports a finding that mother did not demonstrate a capacity and ability to provide for Remington's safety, protection, physical and emotional well-being, and special needs.

As discussed *ante*, mother is progressing in her case plan to address the difficult problem of substance abuse.  We, like the juvenile court, encourage her to continue to do so.  However, the juvenile court's conclusion that there is not a substantial likelihood of reunification by March 2024 is supported by the evidence.

## DISPOSITION

The petition for extraordinary writ is denied on the merits.  (§ 366.26, subd. (*l*)(1)(c); Cal. Rules of Court, rule 8.452.)  The request for a stay is denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

Jackson, P. J.

WE CONCUR:

Simons, J.
Chou, J.

A169066/*Kaitlyn W. v. Superior Court*

20