Filed 7/15/25  In re Dominic H. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re DOMINIC H., a Minor. | B341350 |
| ISMAEL H. et al., | |
| Petitioners and Respondents, | (Los Angeles County Super. Ct. No. 19CCAD02507) |
| v. | |
| BERNARDINO G., | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Nichelle L. Blackwell, Juvenile Court Referee.  Conditionally reversed and remanded with directions.

Christopher Blake, under appointment by the Court of Appeal, for Objector and Appellant.

Leslie A. Barry, under appointment by the Court of Appeal, for Petitioner and Respondent Ismael H.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Petitioner and Respondent Marie H.

Suzanne Davidson, under appointment by the Court of Appeal, for Respondent Dominic H., a Minor.

_____

Bernardino G. appeals from a judgment after a court trial that terminated his parental rights to his biological son, Dominic H., under Family Code sections 7664 and 7822.[1] Bernardino argues the trial court erred in denying him presumed father status under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) before ordering that his consent to the child's adoption was not necessary. (See § 7664, subd. (c).) Bernardino also contends, and respondents concede, the court and parties seeking termination of his parental rights failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq., and related state law. We conditionally reverse and remand for full ICWA compliance but otherwise reject Bernardino's challenges to the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Parties*

Dominic was born in San Joaquin County in November 2014. His biological mother is Brittany T., who is not a party to this appeal. Dominic's biological father is appellant Bernardino.

After Dominic's birth, Brittany signed a declaration of paternity that listed Ismael H., not Bernardino, as Dominic's father. Ismael signed the declaration of paternity as well as Dominic's birth certificate. Ismael has had sole custody of Dominic since his birth. Ismael is married to Brittany's first cousin once removed, Marie H. Dominic has lived exclusively with Ismael and Marie in Los Angeles County since his birth. Ismael, Marie, and Dominic are all respondents on appeal.

---

[1]    Statutory references are to the Family Code unless otherwise indicated.

B.    *The Adoption Case*

In December 2019, Marie filed a stepparent adoption request to adopt Dominic.  In furtherance of that request, in November 2020, Ismael and Marie filed a petition to terminate Brittany's parental rights under section 8604, subdivision (b), which allows a birth parent with sole custody to consent to adoption where the other birth parent has abandoned the child.  Ismael and Marie also filed a petition under sections 7820 and 7822 to free Dominic from Brittany's custody and control alleging Brittany had abandoned him.

In April 2022, Bernardino filed (in Stanislaus County) a petition to declare the existence of a parental relationship under section 7630, alleging he was Dominic's father.  In May 2022, the trial court (in Los Angeles County) appointed counsel for Bernardino, Brittany, and Dominic, and consolidated and stayed proceedings on Bernardino's petition after determining it was related to the adoption case.[2]

Also in May 2022, Ismael and Marie filed a petition under section 7662 to determine the necessity of Bernardino's consent to Dominic's adoption, given he was an alleged father.  In September 2023, the court determined Bernardino was Dominic's biological father based on genetic testing.

In April 2024, Ismael and Marie filed an amended petition for Dominic's freedom from parental custody and control that additionally sought termination of Bernardino's parental rights.

---

[2]    The court also consolidated and stayed proceedings on a petition to determine parental relationship that Brittany had filed in Los Angeles County in October 2019.

A five-day bench trial on the multiple petitions to terminate parental rights was held in August and October 2024. At trial, Brittany did not contest the termination of her paternal rights and instead filed a notarized consent to Dominic's adoption.

C.    *The Trial Evidence*

Before trial, the court granted Marie's unopposed motion to deem true unanswered requests for admission, and determined the following facts were conclusively established:  (1) Bernardino was aware he was possibly Dominic's father before December 2014; (2) Bernardino had known since December 2014 that Dominic was residing with Ismael and Marie; (3) Bernardino had never provided financial support or paid educational or medical expenses for Dominic, nor had he ever received Dominic into his home or had any communication or in-person contact with Dominic; and (4) Bernardino did not take legal action or submit a DNA sample to establish his parentage of Dominic before April 2022.

Evidence presented at trial showed the following additional facts:

Ismael and Marie decided to pursue adoption after being unable to have a biological child.  In 2007, Brittany's grandmother (and Marie's aunt) put Brittany and Marie in touch when Brittany was pregnant and seeking to give up the child for adoption.  Marie met with Brittany and later traveled with Ismael to the hospital in San Joaquin County when Brittany went into labor.  Ismael and Marie left the hospital with the child (Dominic's older biological half-sibling) and drove home to Los Angeles County.  A week later, Brittany retrieved the child

4

from Ismael and Marie after informing them she had changed her mind about the adoption. Ismael and Marie were devastated.

Also in 2007, Brittany and Bernardino started dating. The couple never married but dated on and off and lived together at times. They share two older biological children in addition to Dominic.

In early 2014, Brittany and Bernardino broke up, Bernardino moved into his mother's home with the two older children, and Brittany began living with her grandmother. Brittany then became homeless, and Bernardino lost track of her until one night in late June 2014. At that time, Brittany told Bernardino she was pregnant and he was the father. Brittany went home with Bernardino that night and stayed with him at his mother's place. Brittany occasionally stayed with Bernardino over the next few months and then moved in full-time in September or October when Bernardino's mother asked her to do so on account of the pregnancy.

In September 2014, Brittany reached out to Marie, informing her that she was pregnant and asking her if she would like to adopt the child. A few days later, Ismael and Marie drove to San Joaquin County and met with Brittany. Brittany stated there was no father in the picture and she did not even know who the father was. Ismael and Marie agreed to adopt when Brittany threatened she would abandon the child at the hospital. They collectively agreed to have Ismael sign the birth certificate so that Brittany could not later take the child back.[3]

---

[3] Ismael and Marie testified that the idea of having Ismael sign the birth certificate was Brittany's, while Brittany testified the idea was Ismael's.

In October 2014, Ismael filed (in San Joaquin County) a petition to establish the existence of a parental relationship in which, under penalty of perjury, he falsely described himself as the expected child's biological father and sought sole legal and physical custody. Brittany later signed an acknowledgement of her receipt of the petition.

In late November, Ismael and Marie traveled to San Joaquin County after learning Brittany was in labor. At the hospital, Brittany told Marie that she still wanted Marie and Ismael to take the child. After Dominic's birth, Ismael and Brittany signed the declaration of paternity, under penalty of perjury, and Ismael signed Dominic's birth certificate. Once Dominic was ready to be discharged, Ismael and Marie took him home to Los Angeles County.

Brittany had left Bernardino's mother's home after telling Bernardino that she was going to her sister's house. Before leaving the hospital, Brittany called Bernardino and told him the child had died. In the next day or so, however, after she returned to Bernardino's mother's home, Brittany admitted to Bernardino that the child was alive and that she had given him away to Ismael and Marie.

On December 5, Brittany reported to the San Joaquin County Sheriff's Office that Ismael had "taken" her child to Los Angeles County while acknowledging that she had voluntarily permitted Ismael to sign his name on the child's birth certificate "in order to grant him custody because she was giving the child up to him." The reporting deputy informed Brittany that her complaint "was a civil issue and she needed to contact someone from Family Law." Noting there was no custody order

6

in place, the deputy also advised Brittany to contact Ismael and try to reach an agreement to regain custody of the child.

San Joaquin County Sheriff's Deputy Richard Ester was assigned to further investigate Brittany's allegations of perjury based on a fraudulently signed birth certificate. Ester contacted the San Joaquin County Human Services Agency, which informed him it was aware of the case but was not getting involved because Brittany had "voluntarily surrendered" the child. He also contacted the hospital, which confirmed that Brittany and Ismael had signed a declaration of paternity upon the child's birth.

Over the next few weeks, Ester interviewed Bernardino's mother, Brittany, Bernardino, and Brittany's grandmother, who each relayed the details recounted above. Brittany stated Ismael signed the birth certificate to avoid the legal adoption process, and that she realized she had made a mistake and was now trying to fix it. Ester provided Brittany with a copy of the declaration of paternity along with instructions on how to change its information. Brittany also provided a DNA sample.

Bernardino confirmed Brittany had told him he was the father of the child, then told him the child died, and finally told him she had given the child up for adoption. Bernardino did not provide a DNA sample and instead told Ester he "did not want to do this right now."

Ester also interviewed Ismael and Marie. Marie stated she and Ismael had taken the child home from the hospital upon Brittany's confirmation that she wanted to give him up. Marie also stated Ismael was the child's father based on a brief sexual relationship he had with Brittany. Ismael confirmed this account, explaining he was the child's father based on a one-night

7

stand with Brittany.  Ismael also confirmed he and Marie took custody of Dominic with Brittany's consent.  Ismael and Marie admitted at trial that they lied to Ester when they said Ismael had sex with Brittany.

At the conclusion of his investigation, Ester determined—without knowledge of Ismael and Marie's lie—that no criminal activity had occurred.  He was not contacted by any of the witnesses after completing his report.  Likewise, Ismael and Marie were not contacted by Brittany, Bernardino, or anyone else regarding Dominic after the investigation concluded.

In June 2015, the San Joaquin County Superior Court entered judgment on Ismael's petition to establish a parental relationship, indicating the matter was uncontested and finding Ismael was Dominic's father based on Ismael and Brittany's signed declaration of paternity.  The court granted Ismael full custody with no visitation for Brittany or any other party.

Several months later, about a year after Dominic's birth, Ismael was contacted by a child protective services agency that was seeking to verify the child's well-being in connection with an investigation regarding another child of Brittany's.  Deciding they needed to take action to ensure Dominic was "protected" and "able to stay in a safe and stable home," Ismael and Marie filed a petition for legal guardianship in Los Angeles County.  In their petition filed in October 2016, Ismael and Marie indicated Brittany had willingly placed Dominic in their custody at his birth but also that Ismael had fraudulently signed the declaration of paternity that provided the basis for the paternity judgment.  Ismael and Marie asked the court to vacate or set

aside both the declaration and the judgment.[4]  They further indicated Dominic's biological father's identity and whereabouts were unknown to them.

Hearings on the guardianship petition were held in January and February 2017.[5]  Brittany and Bernardino traveled to Los Angeles and were present for the hearings.

At the first hearing, the probate court appointed counsel for the child but not for Brittany and Bernardino.[6]  Ismael and Marie first became aware of Bernardino at that hearing, and Bernardino—who was not a party to the case—told the court that Dominic had been kidnapped and Bernardino was the child's father.  The court continued the matter.

---

[4]  The petition was filed shortly before the two-year statute of limitations was set to expire for Ismael or a non-signatory to file a challenge to the voluntary declaration of parentage.  (See §§ 7576, 7577.)

[5]  Because the record contains only two brief minute orders and no reporter's transcript for the hearings on the guardianship petition, most of the facts regarding the proceedings on the petition are drawn from the parties' testimony in this case.

[6]  While acknowledging he was not a party and he and Brittany did not seek appointment of counsel, Bernardino now contends the probate court should have appointed counsel for them as a matter of due process, given it was no secret Ismael and Marie intended to adopt Dominic, and they admitted the judgment of Ismael's paternity was based on their fraud. Bernardino suggests we should publish an opinion holding probate courts must appoint counsel for indigent parties in Brittany and Bernardino's position.  We decline to address a proceeding from eight years ago that is not directly at issue in this appeal.

9

Between the hearings, a social worker investigated the situation, interviewed Ismael and Marie, and prepared a report for the court's review. Ismael and Marie told the social worker and the child's counsel that Ismael was not the biological father and that he had fraudulently signed the child's birth certificate.

At the second hearing, the court denied the guardianship petition because Ismael was already the legal parent as reflected in the paternity judgment. Bernardino again told the court that Ismael and Marie had kidnapped Dominic. Brittany also asked if she had any rights as the child's mother. The court explained Ismael had sole custody under the paternity judgment and informed Brittany and Bernardino that they needed to go to family court to raise any complaint regarding Dominic's parentage or custody.

After the guardianship case ended, Ismael and Marie did not have any contact with Bernardino until he filed his petition to determine a parental relationship in April 2022. Bernardino sought full custody of Dominic in that petition. But at trial, when asked if he desired custody of the child, Bernardino responded, "I don't know. I just want him to know who I am."

D.   *The Trial Arguments and Ruling*

Bernardino argued he should be granted presumed father status under *Kelsey S.*, *supra*, 1 Cal.4th 816, and that Ismael and Marie's fraudulent conduct was responsible for his failure to attain that status. Bernardino also asserted the court should vacate the declaration of paternity and dismiss the adoption petition.

Ismael, Marie, and Dominic all argued that Bernardino did not qualify as a presumed father under *Kelsey S.*, emphasizing

10

that Bernardino did not promptly act to assert his parental rights even after Ismael and Marie's fraudulent conduct was revealed. Ismael and Marie asserted termination of Bernardino's parental rights was in Dominic's best interest under section 7664. Dominic's counsel further argued that, even if Bernardino was a *Kelsey S.* father, he abandoned Dominic under section 7822.

In making its ruling, the court started by describing the case as the "messiest, most imperfect, most just tragic adoption proceeding" that it had ever seen. It also recognized throughout its ruling that Ismael, Marie, and Brittany engaged in fraud, and emphasized that its findings were not meant to condone Ismael and Marie's conduct, for which it had "disgust."

The court determined that Bernardino was not a presumed father under *Kelsey S.* because he failed to show a full-fledged commitment to his parental responsibilities to Dominic, either during Brittany's pregnancy or after the birth. Because Bernardino was not Dominic's presumed father, his consent to Dominic's adoption was not necessary under section 7664. The court alternatively found that termination of Bernardino's parental rights was in Dominic's best interest because Bernardino had abandoned the child under section 7822. Finally, the court explained it would let the declaration of paternity stand despite its fraudulent origin because doing so was in Dominic's best interest, which had to "reign[ ] supreme."

The court entered a judgment terminating Bernardino's parental rights.[7] Bernardino timely appealed.

---

[7] The written judgment does not terminate Bernardino's parental rights under section 7664, subdivision (c), and instead reflects only the court's alternative ruling under section 7822.

11

## DISCUSSION

A.  *Termination of Parental Rights Under Section 7664*

Bernardino argues the trial court erred in denying him presumed father status under *Kelsey S.*, *supra*, 1 Cal.4th 816. That ruling was the precursor to the court's determination that Bernardino's consent to Dominic's adoption was not necessary, which order also terminated Bernardino's parental rights under section 7664, subdivision (c).  (See *Kelsey S.*, at p. 823 ["Whether a biological father is a 'presumed father' . . . is critical to his parental rights" in adoption proceedings].)  We discern no error in the court's findings.[8]

1.  *Applicable law*

Whether Dominic's adoption requires Bernardino's consent depends on whether he is a "presumed father" or merely a biological father.  (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050-1051 (*Michael H.*); *Kelsey S.*, *supra*, 1 Cal.4th at p. 823.)  A presumed father can withhold his consent to an adoption unless a court finds, on statutorily specified grounds, that he is unfit. (§§ 8604, subds. (a)-(b), 8606.)  On the other hand, a biological

---

Further, the relevant minute order also omits the section 7664 ruling and states the court found the elements of Probate Code section 1516.5 had been met despite the parties not addressing that statute at trial and the court not referring to it in its oral ruling.  In each instance, we defer to the court's oral ruling, which is clearly reflected in the reporter's transcript.  (See *In re A.C.* (2011) 197 Cal.App.4th 796, 800.)  On remand, the trial court shall correct the written judgment and minute order nunc pro tunc to make them consistent with the court's oral ruling.

8       Bernardino does not challenge the trial court's decision denying his request to vacate the judgment of paternity.

father who does not qualify as a presumed father has no right to block an adoption unless the court finds it is in the child's best interest for the father to retain his parental rights. (§ 7664, subd. (c); *Michael H.*, at pp. 1051-1052.) When the child's best interest is instead for an adoption to proceed, the court can order that the biological father's consent is not required and terminate his parental rights. (§ 7664, subd. (c).)

Under section 7611, a man is presumed to be the father of a child if he has married or attempted to marry the child's mother or he has received the child into his home and openly held out the child as his natural child. (§ 7611, subds. (a)-(d).) Bernardino does not qualify as a presumed father under section 7611.

In *Kelsey S.*, however, the Supreme Court held that an unwed biological father who does not qualify as a presumed father under section 7611 may still have a constitutional right to withhold his consent to an adoption where he has been thwarted from attaining statutory presumed father status. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849; accord, *Michael H.*, *supra*, 10 Cal.4th at pp. 1052, 1054-1055.) The court recognized that a "child has a genetic bond with its natural parents that is unique among all relationships the child will have throughout its life" (*Kelsey S.*, at p. 848), and "[t]he biological connection between father and child is . . . worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full, and enduring relationship" (*id.* at p. 838).

To assert this constitutional right, the biological father must show "he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the

biological mother was pregnant with his child." (*Michael H.*, *supra*, 10 Cal.4th at p. 1060; accord, *Kelsey S.*, *supra*, 1 Cal.4th at p. 849; see also *Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 452 [biological father must demonstrate "an unequivocal commitment to his parental responsibilities"].) He must also demonstrate " 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' " (*Kelsey S.*, at p. 849.) When assessing whether a father constitutes a "*Kelsey S.* father," the court must consider his conduct "both *before and after* the child's birth," including his "public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*; accord, *Adoption of Baby Boy W.*, at p. 452.)

A biological father seeking *Kelsey S.* status bears the burden of establishing the factual predicate for that status. (*In re D.S.* (2014) 230 Cal.App.4th 1238, 1244; *Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679-680.) Bernardino does not challenge any of the court's factual findings. When, as here, the trial court determines the father seeking *Kelsey S.* status has failed to meet his burden of proof, the question on appeal, as in all failure of proof cases, is " 'whether the evidence compels a finding in favor of the appellant[] as a matter of law.' " (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163; accord, *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.) Whether the facts satisfy the legal standard established by *Kelsey S.* is a mixed question of law and fact, and "we exercise our independent judgment in measuring the facts against the applicable legal standard." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.)

2. *The evidence did not compel a finding that Bernardino qualified as a* Kelsey S. *father*

The court found, and Bernardino admits, Bernardino has never met or communicated with Dominic or provided the child with any financial, emotional, or practical support. While Bernardino provided some support to Brittany before Dominic was born and Ismael and Marie (and Brittany) thwarted his ability to assert parental rights at and immediately after Dominic's birth, Bernardino knew Dominic was residing with Ismael and Marie in December 2014 and did not take legal action to establish his parentage until April 2022. These facts do not demonstrate a prompt and full commitment to parental responsibilities that is required for *Kelsey S.* status.

Bernardino also concedes that, despite his pursuit of "the right to veto any adoption," he is not seeking custody of Dominic. Rather, he "only wants Dominic to know the truth of his origins and who he is and who his father is and, possibly, for visitation." But as discussed, to gain presumed father status, a biological father must demonstrate " 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' " (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849; see also *Adoption of T.K.* (2015) 240 Cal.App.4th 1392, 1401 ["If an unwed father's assertion of full commitment to the responsibilities of parenthood means anything, it means he must be prepared to support the child in his own home with his own resources"]; *Adoption of Myah M.*, *supra*, 201 Cal.App.4th at p. 1540 [where "record establishe[d] that mother and father are not able or willing to take immediate custody" of child, parents did not meet *Kelsey S.* requirements]; *Adoption of O.M.*, *supra*, 169 Cal.App.4th at p. 681 [biological father not entitled to *Kelsey S.* status where he

15

did not seek full custody of child, but rather sought "only legal custody, while relegating physical custody to his parents until he is released from his present lengthy incarceration"].)

Instead of arguing that he met the *Kelsey S.* criteria, Bernardino effectively argues he should be excused from doing so in light of Ismael and Marie's fraudulent conduct. He further implicates the San Joaquin County Sheriff's Office, the San Joaquin County Human Services Agency, and the probate court that denied Ismael and Marie's guardianship petition in 2017 and argues these government entities should have done more to reveal and undo that fraudulent conduct. Bernardino asserts these circumstances show this is a unique case, requiring a unique solution.

We readily agree with Bernardino that dishonesty and deceit abound in this case and more thorough investigations by the involved agencies early on could have led to a different outcome. The trial court also acknowledged that the "under the table" adoption and subsequent cover-up in this case are more egregious than the circumstances of a typical *Kelsey S.* case. But as lurid as the facts of this case may be, they do not justify departing from the framework set forth in *Kelsey S.* The *Kelsey S.* analysis turns not on the frustration of a biological father's ability to assert his parental rights but rather on what the father has done in response to that frustration. (See *Kelsey S.*, *supra*, 1 Cal.4th at p. 849 ["[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities *as fully as the mother will allow and his circumstances permit*"], italics added.)

Bernardino's response to the chain of events was not a timely attempt to assume his parental responsibilities as fully as

16

his circumstances permitted. Bernardino refused to give a DNA sample during the San Joaquin County Sheriff's investigation in 2014. Had he provided a DNA sample, it is highly unlikely the sheriff's deputy would have accepted Marie and Ismael's misrepresentation that Ismael was Dominic's biological father. As the trial court found, Bernardino's refusal to get tested showed a lack of commitment to parenting Dominic.

Further, when Bernardino attended the 2017 guardianship proceedings and the probate court advised him that he needed to file any claim for parental rights in family court, he failed to do so until 2022, more than five years later. The trial court properly determined that once Bernardino became aware through the guardianship proceedings of the identity of the man who claimed to be Dominic's father, "he should have pursued his rights and responsibilities as a father more vehemently, more adamantly, and more thoroughly in a committed manner to show . . . he wanted his child." Bernardino's inaction is thus at least partially to blame for his failure to assume a parental role. (See *Adoption of O.M.*, *supra*, 169 Cal.App.4th at pp. 680-681 [father's crime and incarceration responsible for failure to qualify for *Kelsey S.* status, not just mother's refusal to communicate].)

Because Bernardino failed to demonstrate a prompt and full commitment to his parental rights, the trial court properly concluded he was not a presumed father under *Kelsey S.* Bernardino does not challenge the court's subsequent determination that adoption was in Dominic's best interest.[9]

_____

[9] Even if he had, substantial evidence supports the finding as to Dominic's best interest. At the time of trial, Dominic was almost 10 years old and had been living with Ismael and Marie

17

Thus, the court did not err in ordering that Bernardino's consent to the child's adoption was not necessary and terminating his parental rights as a biological father under section 7664, subdivision (c).[10]

## B. *ICWA Conditional Reversal*

Although the trial court properly terminated Bernardino's parental rights under section 7664, we agree with the parties that conditional reversal of the judgment is necessary because

---

since birth.  Ismael and Marie each had a loving bond with Dominic, and they were fully providing for his needs.  They were also the only parents he had ever known.  Bernardino conceded in the trial court and on appeal that remaining in Ismael and Marie's care was best for Dominic.

[10]     The court alternatively found that, even if Bernardino did qualify as a *Kelsey S.* father, he abandoned the child under section 7822.  That abandonment ruling is supported by the same substantial evidence that supports the *Kelsey S.* determination. (See § 7822, subd. (a)(2) [court may declare a child free from a parent's custody and control if the parent has left the child "in the care and custody of another person for a period of six months without any provision for the child's support, or without communication from the parent . . . , with the intent on the part of the parent . . . to abandon the child]; *id.*, subd. (b) [the "failure to provide support[ ] or failure to communicate is presumptive evidence of the intent to abandon"]; *Adoption of A.B.* (2016) 2 Cal.App.5th 912, 923-924 [father's perfunctory efforts to see and communicate with child and lack of active inquiry or pursuit of visitation for more than four years was sufficient to show intent to abandon]; *In re Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1013 [father's failure to communicate with or provide support for child for over three years showed intent to abandon].)

18

the court and the petitioning parties did not fulfill their duty to inquire whether Dominic is, or might be, an Indian child.

Congress enacted ICWA to protect Indian children and "to promote the stability and security of Indian tribes and families" by formalizing federal policy and standards regarding the removal and placement of Indian children outside the family home.  (25 U.S.C. § 1902; see *In re Dezi C.* (2024) 16 Cal.5th 1112, 1129 (*Dezi C.*).)  "ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*Dezi C.*, at p. 1129; see 25 U.S.C. §§ 1902, 1921.)  "[W]hen ICWA applies, 'the Indian child's tribe shall have a right to intervene at any point' in a proceeding involving the removal of an Indian child from their family." (*Dezi C.*, at p. 1129; see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8.)

ICWA applies in proceedings to terminate parental rights. (See §§ 170, subd. (c), 177, subd. (a), 180; see also Cal. Rules of Court, rule 5.480.)[11]  As a result, the court and any petitioner seeking a termination of parental rights have an affirmative and continuing duty to inquire whether a child who is subject to the proceedings is, or may be, an Indian child.  (Welf. & Inst. Code, § 224.2, subd. (a); rule 5.481(a).)  This duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."  (Welf. & Inst. Code, § 224.2, subd. (b)(2); rule 5.481(a)(1)-(2).)

---

[11]     All references to rules are to the California Rules of Court.

19

When an ICWA inquiry is inadequate, prejudice is impossible to ascertain.  (*Dezi C.*, *supra,* 16 Cal.5th at p. 1136.)  Under these circumstances, remand is required along with directions to the court and any other responsible party to fully comply with the duty of inquiry—and, when necessary, ICWA's further notice requirements—and to document said compliance.  (*Ibid.*)

Along with the 2019 adoption request, Ismael and Marie each submitted a signed form denying any Indian ancestry.  (See rule 5.480(a)(1).)  But there is no indication elsewhere in the record that inquiry was made regarding the potential Indian ancestry of Dominic, Brittany, Bernardino, or any members of the child's extended biological family, including Bernardino's mother and Brittany's grandmother.  The record also does not include a finding from the court at the trial that culminated in the termination of Bernardino's parental rights as to whether ICWA applied.  Accordingly, we conditionally reverse the judgment terminating parental rights and remand the matter for the court and petitioning parties to fulfill their duty of inquiry and, if necessary, further notice obligations under ICWA.

## DISPOSITION

The judgment terminating Bernardino's parental rights is conditionally reversed. If, after reasonable inquiry, the court finds there is no reason to believe Dominic is an Indian child, or if no tribe or agency determines Dominic is an Indian child after notice has been provided under ICWA, the judgment shall be reinstated. If, on the other hand, a tribe determines Dominic is an Indian child and the trial court finds ICWA applies, the court shall proceed in accordance with ICWA.

           STONE, J.

We concur:


SEGAL, Acting P. J.


FEUER, J.

21